**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Willie A. NEWMAN, Defendant–
Appellant.**

**No. 97–3246.**

United States Court of Appeals,
Seventh Circuit.

Argued April 1, 1998.

Decided May 20, 1998.

---

James M. Warden (argued), Office of the United States Attorney, Indianapolis, IN, for Plaintiff–Appellee.

Linda M. Wagoner, William E. Marsh (argued), Indiana Federal Community Defenders, Inc., Indianapolis, IN, for Defendant–Appellant.

Before CUDAHY, FLAUM, and EVANS, Circuit Judges.*

FLAUM, Circuit Judge.

A jury convicted Willie Newman of armed robbery of a bank in violation of 18 U.S.C. § 2113(a) & (d). This was Newman's third violent felony conviction—his "third strike" under 18 U.S.C. § 3559(c)(1)—and the district court therefore imposed the mandatory sentence of life imprisonment. On appeal, Newman challenges the district court's denial of a motion to suppress various witnesses' identifications of him, as well as the court's decision to order restitution, the amount of that restitution, and an upward adjustment of his sentence based upon his physical restraint of a person during commission of a violent felony. We affirm Newman's conviction, sentence of life imprisonment, and the district court's order of restitution.

I.

On April 19, 1996, Willie Newman robbed an Indianapolis branch of Bank One without wearing a mask. Before he entered the bank, Newman attempted to steal a getaway car from Terrance Lloyd, who was waiting to pick up his wife at the bank. Newman stated, "I need your truck; I'm going to rob a bank." Mr. Lloyd resisted, which led Newman to force Lloyd out of his truck and into the bank, allegedly at gunpoint. Once inside the bank, Newman pushed Lloyd aside and announced to all present that he was robbing the bank. Newman ordered Regina Lloyd (Terrance's wife and a bank employee) to place the bank's money in Newman's dark blue duffle bag. After getting the money, Newman grabbed Toni Ashford, the branch manager, allegedly pressed a gun against her through his duffle bag, and told her, "You are going with me." Newman held Ashford as a human shield until he got to the door; once outside, he ordered her to return to the bank.

Upon ordering Ashford back into the bank, Newman fled the scene on foot. Two blocks away from the bank, Newman accosted three employees of the Indianapolis water company. Newman told the men, "I just robbed a bank, I need your truck." He also allegedly announced that he had a gun and asked the

* This opinion was circulated before release among all judges of this Court in active service in accordance with Seventh Circuit Rule 40(e). No judge requested to hear the case en banc.

men if they wanted to die; two of the employees claimed to have seen a gun in Newman's duffle bag. The employees surrendered the company's truck immediately, and Newman sped away.

Newman left a trail of witnesses and evidence in his wake that police could easily and quickly follow. He crashed the water company's truck near a construction site close to his home and walked the rest of the way home while discarding some of his clothing along the way. He also dropped $250 of recorded currency from the bank in an alley behind his house. Following Newman's trail, police officers swarmed the area surrounding the crashed and abandoned truck.

One officer observed Newman moving furtively around his backyard and attempting to avoid detection by another nearby officer. When the observing officer ordered Newman to freeze, Newman responded, "You are going to have to catch me!" and then ran into his house. The officers pursued Newman into the house and discovered him holding a fistful of currency that he was removing from a dark blue duffle bag. Before the police could ask any questions or give any directions, Newman exclaimed, "I didn't rob nobody!" Officers found a bundle of fifty twenty-dollar bills bearing the stamp and initials of tellers from the bank, as well as another packet of money on the ground and a few ten- and twenty-dollar bills scattered along a row of fence posts near Newman's home. After officers arrested him, Newman naively asked, "If you don't find the money, will I be okay?"

The Indianapolis Police Department began gathering witnesses to the robbery almost immediately. Once officers apprehended Newman, other officers brought the Lloyds and Toni Ashford from the bank to Newman's residence to make an identification. The witnesses were told only that they were being taken to this location to identify a suspect. The witnesses were brought in separate cars to view Newman in a "show-up identification" procedure [1] in which Newman

stood handcuffed in front of his house next to a police officer; the house was surrounded by yellow crime scene tape when the witnesses arrived. Each witness positively identified Newman as the bank robber. These identifications took place a little over one hour after the robbery.

A grand jury indicted Newman for armed robbery (18 U.S.C. § 2113(a) & (d)) and for using a gun in the commission of a violent felony (18 U.S.C. § 924(c)). The district court denied Newman's motion to suppress the show-up identifications, and at trial the Lloyds and Toni Ashford again identified Newman as the perpetrator. In addition, one of the water company employees identified Newman as the man who stole the company's truck,[2] and a carpenter at the construction site near the crashed truck identified Newman as the man who abandoned the truck and walked away while discarding his clothing. Many of these witnesses at trial also identified the duffle bag and the clothing worn by Newman during the robbery.

The jury convicted Newman of bank robbery, but it acquitted him on the gun charge. According to the mandate of 18 U.S.C. § 3559(c)(1), the district court sentenced him to life imprisonment because this was his third serious violent felony conviction. Moreover, based on an audit allegedly prepared by the bank, the district court ordered Newman to make restitution to the bank pursuant to 18 U.S.C. § 3663A in the amount of $11,973. The court, however, concluded that Newman's financial status precluded the imposition of any additional fine.

## II.

Newman raises four issues on appeal. He first argues that the district court erroneously denied his motion to suppress the show-up identifications of the Lloyds and Toni Ashford; these highly suggestive pre-trial identifications, he contends, predisposed the witnesses to identify him incorrectly at trial in violation of his due process rights. In addi-

---

1. A show-up identification, unlike a traditional line-up, consists of a witness viewing only one suspect.

2. Another water company employee, however, identified a random member of the courtroom audience as the perpetrator.

tion, he contests both the district court's calculation of its restitution order and the decision to order restitution in the first place. Finally, Newman challenges the district court's decision to apply USSG § 2B3.1(b)(4)(B) in calculating his sentence based on his use of physical restraint during the commission of a crime. We reject all of these claims.

### A. Show-up Identification

■ Newman argues that the trial court should have suppressed the out-of-court identifications made by Ashford and the Lloyds. The witnesses were brought in separate cars to Newman's home, which was cordoned off by yellow crime scene tape; upon the witnesses' arrival, a police officer brought Newman in handcuffs to a spot approximately eight to ten yards from each car. The circumstances surrounding these show-up identifications, he contends, were unduly suggestive and created a serious likelihood that the witnesses subsequently made unreliable identifications at trial.[3] Newman claims that these irreparably-tainted identifications violated his due process rights. The district court rejected Newman's due process claim and found that the identification procedures employed in this case were neither unduly suggestive nor likely have caused a risk of an unreliable identification.

■ We review the district court's due process determination *de novo*. *See Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996).[4] Newman must satisfy two conditions to prevail on his due process claim. *See United States v. Funches*, 84 F.3d 249, 253 (7th Cir.1996). He must first show that the challenged show-up identification procedure was unreasonably suggestive. We have noted many times that a show-up identification, in which witnesses confront only one suspect, is inherently suggestive and should be employed only if compelled by extraordinary circumstances. *See, e.g., id.* at 254 (advising that "show-ups be employed with restraint to avoid the suggestiveness inherent in such confrontations" and discussing circumstances that might justify a show-up); *United States ex rel. Kirby v. Sturges*, 510 F.2d 397, 403 (7th Cir.) (Stevens, J.) ("Without question, almost any one-to-one confrontation between a victim of crime and a person whom the police present to him as a suspect must convey the message that the police have reason to believe him guilty."), *cert. denied*, 421 U.S. 1016, 95 S.Ct. 2424, 44 L.Ed.2d 685 (1975); *see also Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) ("The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."), *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). Simple convenience rather than extraordinary urgency compelled the use of a showup in this case; the police had more than enough evidence against Newman to render the expedited identifications unnecessary at that point. Moreover, the Government has not demonstrated that there was a need to complete the identification process without a formal, multi-suspect lineup because of a danger of losing the testimony of any of the witnesses.

■ Even assuming that he satisfied this first condition, however, Newman must also establish that the identification is unreliable under the totality of the circumstances.

---

3. Additionally, Newman makes an unsupported argument in his brief that the identifications violated his due process rights because the police did not have probable cause to hold him at that time. He disavowed this argument at oral argument, so we do not consider it.

4. Some of our prior cases have suggested that we review a due process determination for clear error in the context of identification testimony. *See United States v. Moore*, 115 F.3d 1348, 1359 (7th Cir.1997); *United States v. Hall*, 109 F.3d 1227, 1237 (7th Cir.1997). To the extent that we are reviewing the district court's findings of his-

torical fact (*i.e.*, the events that occurred as part of the identification), those prior cases correctly state our reviewing posture. The Supreme Court's decision in *Ornelas*, however, emphasizes that courts must give *de novo* review to mixed questions of law and fact. The ultimate due process determination, while admittedly fact-intensive, is an assessment of the legal effect of the interplay of various historical facts rather than simply a finding that those historical facts occurred in a particular way. This is a classic example of a mixed question of law and fact, and it therefore must receive plenary review.

See *Funches*, 84 F.3d at 253. This consideration is the lynchpin of the due process calculus in identification cases; the Supreme Court has stated that "the primary evil to be avoided is a very substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). Toward this end, the Court has recognized that "admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability." *Manson v. Brathwaite*, 432 U.S. 98, 106, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The Supreme Court has suggested five factors to guide the due process inquiries of the lower courts in identification cases. *See Neil*, 409 U.S. at 199–200. We are directed to assess the reliability of witness identifications by examining the "opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.*

We believe that the witnesses' identifications in this case satisfy all of these indicia of reliability. All three witnesses observed Newman for the full ten to fifteen minute period during which he robbed the bank. *See, e.g., United States v. Duprey*, 895 F.2d 303, 308 (7th Cir.1989) (finding no due process violation because, among other reasons, a witness identified the defendant after observing him for five minutes in a motel lobby), *cert. denied*, 495 U.S. 906, 110 S.Ct. 1927, 109 L.Ed.2d 291 (1990). Regina Lloyd took orders from him at about one arm's length, while Terrance Lloyd and Toni Ashford stood only a few feet away from Newman when he was not holding them next to his body as hostages. Furthermore, both the robbery and identifications occurred in the daylight of mid- to late-afternoon. Newman allegedly brandished a gun to get the attention of the witnesses, who testified that his volatile behavior and, in the cases of Mr. Lloyd and Ashford, his physical restraint ensured their rapt attention during the duration of the robbery. The witnesses were not merely casual or passing observers of the bank robber. *See, e.g., Manson*, 432 U.S. at 115 (finding no due process violation because, among other reasons, the witness was more than a casual observer whose attentiveness to the defendant's appearance suggested that the challenged identification was reliable). The witnesses described the robber to police officers as an older black man with a long, thin face; they also listed his height as somewhere between 5'6" and 5'8". Importantly, they described his dark warm-up jacket and pants, dirty white tennis shoes, and dark blue duffle bag. Newman fit these descriptions, although he actually stands 5'9" tall. *See, e.g., Johnson v. McCaughtry*, 92 F.3d 585, 596 (7th Cir.1996) (finding no due process violation despite witnesses' minor error in description of the defendant's height when other factors strongly suggested the reliability of the challenged identification). All witnesses expressed a high degree of certainty that Newman was the bank robber; indeed, Toni Ashford exclaimed, "There he is!" before the police had managed to bring Newman down from his porch for the show-up identification. Finally, the expedited nature of the identification (occurring within sixty to ninety minutes after the robbery) enhances the reliability of these witnesses' identifications. *See, e.g., United States v. Watson*, 587 F.2d 365, 367 (7th Cir.1978) (finding no due process violation because, among other reasons, a witness identified a bank robber within two hours of the robbery). Analyzing all of these factors leads us to conclude that the district court properly denied Newman's motion to suppress the show-up identifications.

### B. Restitution

Newman poses two challenges to the district court's order of restitution. First, he argues that the court's application of the Mandatory Victims Restitution Act of 1996 (MVRA), 18 U.S.C. § 3663A, to his criminal conduct violated the Constitution's Ex Post Facto Clause. *See* U.S. CONST. Art. I, § 9, cl. 3. Second, he argues alternatively that if the court properly ordered some measure of restitution, it abused its discretion in calcu-

lating the amount at $11,973. We reject both of his restitution claims.

### 1. Ex Post Facto Claim

■ Congress amended the Victim and Witness Protection Act (VWPA) in 1996 as part of its continuing effort to guarantee restitution to the victims of criminal conduct. Under the old version of the Act (18 U.S.C.A. § 3663(a) (1994)), district courts were authorized, but not required, to order restitution. Crucial to this discretionary decision was the defendant's financial standing. Before a district court could order any restitution, the old Act required the court to determine how much, if any, restitution a defendant could make in light of "the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." 18 U.S.C. § 3663(a)(1)(B)(i)(II) (1994).

The MVRA, however, discarded this discretionary balancing system. Congress directed courts to apply the MVRA "in cases in which the defendant is convicted on or after the date of enactment of this Act (April 24, 1996)". 18 U.S.C. § 2248 (statutory notes). As the new Act's name suggests, courts no longer have discretion in awarding restitution to the victims of a defendant's criminal activity (except in very limited circumstances not relevant here, see 18 U.S.C. § 3663A(c)(3)). The language of the new Act speaks in terms of the restitution that courts "shall order" rather than that which they "may order,"

which was the language used in the previous version of the VWPA. *See, e.g.,* 18 U.S.C. § 3663A(a)(1) & (b). Under the MVRA, a defendant's financial status is relevant only to fixing a payment schedule for the mandated restitution payments. *See* 18 U.S.C. § 3664(f)(1)(A) ("In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."); *see also* 18 U.S.C. § 3664(f)(2) & (3) (discussing different modes of incremental payment schedules that courts may order).[5] Newman points out that the district court concluded that he could not pay a fine but nevertheless ordered restitution (which he also claims to be unable to pay) in accordance with the MVRA.

■ There is little doubt that the new statute operated to Newman's detriment in this case, but the issue is whether that disadvantage rises to the level of an ex post facto violation. The Supreme Court first addressed the scope of the protections of the Ex Post Facto Clause in *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798). Justice Samuel Chase's opinion noted that the Clause, *inter alia,* prohibited the enactment of a "law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Id.* at 390. Such a law implicates the central concern of the Clause: "the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was

---

**5.** It is true that the same sentence—full restitution—was available as an option to the district court under the pre–1996 VWPA. In this way, it could be argued that forcing courts to impose that sanction did not technically "increase" a defendant's punishment in violation of the Ex Post Facto Clause. We do not, however, find this argument persuasive. The MVRA removed the discretion previously possessed by courts to refuse to order restitution if a defendant did not have the financial resources to satisfy the order. Indeed, our cases held that an order of restitution under the VWPA could not stand if the district court ordered restitution either (1) without considering the defendant's ability to pay, *see, e.g., United States v. Jaroszenko,* 92 F.3d 486, 491 (7th Cir.1996), or (2) in an amount so high that, as a practical matter, the defendant had no hope of satisfying the restitution order, *see, e.g., United States v. Wilson,* 98 F.3d 281, 284 (7th

Cir.1996). The district court in this case stated that it failed to order a fine because Newman lacked the financial resources to pay it now and demonstrated "a future inability to pay" any such fine. The court would have taken that same factor into consideration in its decision to award restitution under the pre–1996 VWPA, but the MVRA forced the court to impose the full amount of restitution on Newman without any reprieve for his inability to pay. Indeed, a defendant's financial status is relevant under the MVRA only to the extent that the court is allowed to order nominal periodic payments toward satisfaction of the full amount. *See* 18 U.S.C. § 3664(f)(3)(B). We believe that the difference between having to pay no restitution at all and paying it on a periodic schedule is significant enough to constitute an "increase" in punishment.

prescribed when the crime was consummated." *Weaver v. Graham,* 450 U.S. 24, 30, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981). To prove his ex post facto claim, Newman must show both that the challenged law operates retroactively (*i.e.,* applies to criminal conduct occurring before its enactment) and that it increases the punishment for that criminal conduct. *See United States v. Withers,* 128 F.3d 1167, 1169–70 (7th Cir.1997); *see also Kansas v. Hendricks,* —— U.S. ——, 117 S.Ct. 2072, 2081, 138 L.Ed.2d 501 (1997) (rejecting the petitioner's claim because the challenged state statute did not impose the kind of punishment that implicated the Ex Post Facto Clause); *Lynce v. Mathis,* 519 U.S. 433, 117 S.Ct. 891, 895–96, 137 L.Ed.2d 63 (1997) (rejecting the petitioner's claim because the challenged state regulation did not increase the punishment for his criminal conduct).

■ We give *de novo* review to the district court's decision to apply the MVRA to Newman's charged conduct. *See, e.g., United States v. Wright,* 48 F.3d 254, 255 (7th Cir. 1995). First, there is no doubt that the district court applied the new provisions retroactively to criminal conduct that occurred before the MVRA's effective date. *See Lynce,* 117 S.Ct. at 896 ("To fall within the *ex post facto* prohibition, a law must be retrospective—that is 'it must apply to events occurring before its enactment' . . . .") (quoting *Weaver,* 450 U.S. at 29); *California Dep't of Corrections v. Morales,* 514 U.S. 499, 505, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995) (noting that the Ex Post Facto Clause "forbids the application of any new punitive measure to a crime already consummated") (citation omitted). Newman's robbery occurred on April 19, 1996, at which time the MVRA had not yet come into effect. Congress stated that the MVRA should apply to defendants convicted on or after April 24, 1996. This feature of the new Act ensured that some defendants, like Newman (who was convicted on April 28, 1997), would be sentenced according to the MVRA even though the statute was not effective at the time of their criminal conduct.

■ Even if a law operates retroactively, it does not violate the Ex Post Facto Clause unless it disadvantages the defendant by "altering the definition of criminal conduct or increasing the punishment for that crime." *Lynce,* 117 S.Ct. at 896 (quoting *Weaver,* 450 U.S. at 29). Newman's ex post facto claim falters on this ground because we do not believe that restitution qualifies as a criminal punishment. Restitution has traditionally been viewed as an equitable device for restoring victims to the position they had occupied prior to a wrongdoer's actions. *See* RESTATEMENT OF RESTITUTION (introductory note) (1937) (tracing the history of restitution throughout the common law). It is separate and distinct from any punishment visited upon the wrongdoer and operates to ensure that a wrongdoer does not procure any benefit through his conduct at others' expense. *See* 1 GEORGE E. PALMER, THE LAW OF RESTITUTION § 1.1, at 5 (1978) (noting that prevention of unjust enrichment is the central idea of restitution); *United States v. Gifford,* 90 F.3d 160, 163 (6th Cir.1996) (recognizing that the "primary purpose of restitution is to compensate the innocent victim of a crime"). The criminal law may impose punishments on behalf of all of society, but the equitable payments of restitution in this context inure only to the specific victims of a defendant's criminal conduct and do not possess a similarly punitive character. *See generally United States v. Ursery,* 518 U.S. 267, 116 S.Ct. 2135, 2149, 135 L.Ed.2d 549 (1996) (stating in the context of the Double Jeopardy Clause that the fact that sanctions are "tied to criminal activity . . . is insufficient to render the [sanctions] punitive").

We have observed the non-punitive character of restitution in previous cases. In *United States v. Black,* 125 F.3d 454, 467 (7th Cir.1997), the defendant claimed that the district court's order of restitution under the Child Support Recovery Act of 1992 (CSRA)[6] violated the Ex Post Facto Clause because it punished acts undertaken before enactment of the CSRA. We rejected his claim and stated flatly: "Restitution is not

---

**6.** As we discuss *infra* at 539–540, the CSRA's restitution provision, 18 U.S.C. § 228(c), merely authorizes restitution payments "under section 3663"—*i.e.,* under the VWPA.

'punishment' within the meaning of the Ex Post Facto Clause." *Id.* Other courts have rejected similar challenges. *See, e.g., United States v. Hampshire,* 95 F.3d 999, 1006 (10th Cir.1996) (rejecting ex post facto challenge because restitution under the CSRA is not criminal punishment). In addition, other courts have stated their general belief that restitution is not a criminal penalty. *See, e.g., United States v. Arutunoff,* 1 F.3d 1112, 1121 (10th Cir.) ("The VWPA's purpose is not to punish defendants ... but rather to ensure that victims, to the greatest extent possible, are made whole for their losses."), *cert. denied,* 510 U.S. 1017, 114 S.Ct. 616, 126 L.Ed.2d 580 (1993); *United States v. Rochester,* 898 F.2d 971, 983 (5th Cir.1990) ("The restitution imposed pursuant to the VWPA ... is not in the nature of a fine. Rather, the purpose of the VWPA is to ensure that wrongdoers, to the degree possible, make their victims whole.") (internal quotation omitted).[7]

The Eighth Circuit disagrees with our characterization of restitution under the VWPA. That court has held that restitution under the CSRA is not punishment, *see Crawford,* 115 F.3d at 1403, but it has attempted to distinguish the restitution authorized by the VWPA. In *United States v. Williams,* 128 F.3d 1239, 1241–42 (8th Cir. 1997), the court noted that 18 U.S.C. § 228(b) authorizes the punishment of violators of the CSRA while restitution under that act is authorized by a completely separate section of the same statute (18 U.S.C. § 228(c));[8] this distinction assumed great significance for the court, which held that restitution under the VWPA was punishment for ex post facto purposes because the VWPA did not make a similarly explicit statutory distinction between restitution and criminal punishment. *See id.*

Respectfully, we believe that the Eighth Circuit's reasoning is fundamentally flawed. First, the VWPA authorized restitution in legislation separate from any proscriptions against criminal behavior; if the Eighth Circuit can draw support from the CSRA's segregation of criminal punishment and restitution within the boundaries of one enactment, then it would seem even more significant that Congress authorized restitution under the VWPA by a completely separate statute. Second, and more fundamentally, the purportedly "separate" restitution provision of the CSRA—18 U.S.C. § 228(c)—does nothing more than direct courts to impose restitution *in accordance with the provisions of the VWPA* (18 U.S.C. § 3663). Thus, there can be no distinction between the restitution authorized by the CSRA and the VWPA because both are awarded pursuant to the same statutory provision; restitution cannot be punishment under only one statute but not the other. If anything, the Eighth Circuit's opinion supports our position by observing that the explicit distinction between punishment and restitution drawn in the CSRA demonstrates that Congress does not

---

**7.** To be sure, our view of restitution is not universally shared. *See, e.g., United States v. Miguel,* 49 F.3d 505, 506 (9th Cir.) (referring to restitution as a penalty), *cert. denied,* 515 U.S. 1166, 115 S.Ct. 2628, 132 L.Ed.2d 868 (1995); *United States v. Rico Indus., Inc.,* 854 F.2d 710, 714 (5th Cir.1988) ("Restitution is a criminal penalty."), *cert. denied,* 489 U.S. 1078, 109 S.Ct. 1529, 103 L.Ed.2d 834 (1989); *United States v. Sleight,* 808 F.2d 1012, 1020 (3d Cir.1987) (stating that restitution "is imposed as a part of sentencing and remains inherently a criminal penalty"). Three Circuits have recently stated, without any reasoning or justifications, that the amendments of the MVRA operate as punishment and would violate the Ex Post Facto Clause if applied retroactively to defendants. *See United States v. Rezaq,* 134 F.3d 1121, 1140 n. 13 (D.C.Cir.1998); *United States v. Baggett,* 125 F.3d 1319, 1322 (9th Cir. 1997), *cert. denied,* — U.S. —, 118 S.Ct. 1089, 140 L.Ed.2d 145 (1998); *United States v. Thomp-son,* 113 F.3d 13, 14 n. 1 (2d Cir.1997); *see also United States v. Sclafani,* 996 F.Supp. 400, 403–04 (D.N.J. 1998).

**8.** The CSRA provides in relevant part:

(b) Punishment.—The punishment for an offense under this section is-
(1) in the case of a first offense under this section, a fine under this title, imprisonment for not more than 6 months, or both; and
(2) in any other case, a fine under this title, imprisonment for not more than 2 years, or both.
(c) Restitution.—Upon a conviction under this section, the court shall order restitution under section 3663 in an amount equal to the past due support obligation as it exists at the time of sentencing.
18 U.S.C. § 228(b) & (c).

consider restitution (authorized by the VWPA) to be punishment.

We draw further support from the Supreme Court's recent decisions in *Kansas v. Hendricks*, —— U.S. ——, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), and *Hudson v. United States*, —— U.S. ——, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997). The Hendricks Court, as we noted earlier, rejected the petitioner's claim of an ex post facto violation because the challenged civil commitment statute was not punitive in nature. *See* 117 S.Ct. at 2081–85; *id.* at 2085 ("Our conclusion that the Act is nonpunitive thus removes an essential prerequisite for both Hendricks' double jeopardy and ex post facto claims."). In so doing, the Court combined its analysis of the petitioner's *ex post facto* and double jeopardy claims; according to the Court, the crucial inquiry in each claim was whether the challenged punishment was criminal in nature. *See id.* at 2085. For this reason, in adjudicating Newman's ex post facto claim, we ascertain the nature of the restitution penalty according to the methodology recently endorsed by the Court in *Hudson*, 118 S.Ct. at 493, a case involving a double jeopardy claim. Under this framework, courts determine the character of a sanction by first examining "whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other." *Id.* (quoting *United States v. Ward*, 448 U.S. 242, 248, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). If the legislature nominally designates a penalty as civil or if the label is ambiguous, courts look deeper to see "whether the statutory scheme was so punitive either in purpose or effect ... as to transfor[m] what was clearly intended as a civil remedy into a criminal penalty." *Id.* (quotations omitted) (alteration in original). The *Hudson* Court deemed the following factors to be "useful guideposts" in this inquiry:

(1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as punishment; (3) whether it comes into play only on a finding of *scienter;* (4) whether its operation will promote the traditional aims of punishment—retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned.

*Id.* (quoting *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)).

We believe that, under the *Hudson* test, the restitution authorized by the VWPA is not punitive in nature. Neither the VWPA nor the MVRA expressly characterizes restitution as a criminal or civil penalty. Rather, sections 3663A(a)(1) and 3663(a)(1)(A) both simply state that restitution should be made in addition to or in lieu of "any other penalty authorized by law".[9] The other penalties in this context could be either civil or criminal punishments (fines, forfeiture, imprisonment, etc.), so it is not possible to draw an inference regarding the character of restitution in this inquiry solely from the word "other". The express language of the statutes does not provide any further clue about the character of their penalties.

Delving deeper, the Supreme Court's multi-factor *Hudson* test demonstrates that restitution is a civil remedy that is not "so punitive either in purpose or effect" as to acquire a criminal character. *Hudson*, 118 S.Ct. at 493 (quoting *Ward*, 448 U.S. at 249). Payment of restitution is not an affirmative disability or restraint that operates in a manner analogous to imprisonment. *See Flemming v. Nestor*, 363 U.S. 603, 617, 80 S.Ct.

---

**9.** The Eighth Circuit's opinion in *Williams* imbued this language with great significance in concluding that the "plain language" of the VWPA and MVRA demonstrated that restitution is a criminal punishment. *See* 128 F.3d at 1241. We simply cannot agree that the use of the word "penalty" can be dispositive of the issue. Indeed, the same word is used in the Supreme Court's *tests* for ascertaining the character of a challenged punishment: whether the "penalizing mechanism" announces itself as civil or criminal punishment, and "[e]ven in those cases where the legislature has indicated an intention to establish a civil penalty, we have inquired further...." *See Hudson*, 118 S.Ct. at 493 (quotation omitted).

1367, 4 L.Ed.2d 1435 (1960). The payment requirements do not constitute any sort of "debtor's prison" on top of a criminal penalty; the MVRA directs courts to award only nominal restitution—and even that amount can be paid on a periodic payment plan—if "the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments." 18 U.S.C § 3664(f)(3)(B). While not as solicitous of indigence as the pre–1996 VWPA, these new provisions authorize courts to fashion restitution orders precisely to avoid any prison-like disability or restraint.

Other *Hudson* factors support the conclusion that restitution is not a punitive sanction. We have noted that, historically, restitution has been considered an equitable, remedial measure designed to prevent the unjust enrichment of wrongdoers at the expense of innocent third-parties. See supra at 538–539; *see also Hudson*, 118 S.Ct. at 495–96 (noting that money penalties have not been viewed historically as punishment); *S.A. Healy Co. v. Occupational Safety & Health Review Comm'n*, 138 F.3d 686, 688 (7th Cir.1998) ("[M]oney penalties have not been viewed historically as criminal punishment."). Moreover, the VWPA makes restitution available as a sanction for criminal violations [10] without regard to the violator's state of mind; if the underlying criminal violation did not require scienter, then the restitution order similarly would not require such a showing. The VWPA therefore authorizes payments without regard to scienter, even though most federal criminal laws contain this requirement. This lack of an independent scienter requirement, though, lends some support to the proposition that

restitution itself is not a criminal punishment.

In addition, restitution payments do not directly promote the traditional aims of punishment: retribution and deterrence. Of course, it is always possible to justify a sanction—even a criminal prohibition—as serving purposes other than these two factors. Our analysis in this area, therefore, must identify the primary purposes of the challenged sanction. *See Hudson*, 118 S.Ct. at 496 ("To hold that the mere presence of a deterrent purpose renders such sanctions 'criminal' for double jeopardy purposes would severely undermine the Government's ability to engage in effective regulation of institutions such as banks."). For instance, in *LaCrosse v. Commodity Futures Trading Commission*, 137 F.3d 925, 931–32 (7th Cir.1998), we noted that an occupational bar might have some deterrent and retributive effects, but that it was primarily designed "to ensure the integrity of the markets regulated by the [Commodity Futures Trading] Commission." The inherent and primary purpose of restitution is to compensate the victim of crime rather than to affect the criminal in some way; the MVRA, as we have noted, barely concerns itself with the effect of restitution upon a defendant in its attempt to ensure that victims of a defendant's criminal activity are made whole. *See Government of Virgin Islands v. Davis*, 43 F.3d 41, 47 (3d Cir.1994) ("[R]estitution ordered under the VWPA is compensatory rather than punitive. Awards are designed to compensate victims for their losses, rather than to serve retributive or deterrent purposes."), *cert. denied*, 515 U.S. 1123, 115 S.Ct. 2280, 132 L.Ed.2d 283 (1995). It is difficult to say that the primary purpose of the MVRA or VWPA is to punish criminals.

At the very least, under the final two *Hudson* factors, restitution serves an "alternative purpose" aside from retribution and

---

**10.** The fifth factor prescribed by the *Hudson* Court directs us to ascertain "whether the behavior to which it applies is already a crime". The VWPA only authorizes restitution awards as part of sentencing for criminal violations, so the underlying behavior for which restitution is awarded is already criminalized. This factor ostensibly weighs against viewing restitution as a non-punitive sanction, although the Court seems to have rejected the "same-conduct" test for characterizing punishments in the double jeopardy context. *See United States v. Dixon*, 509 U.S. 688, 704, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). Assuming that this factor would suggest that restitution is a criminal penalty, it would not overcome the strong contrary evidence in a balancing of the relevant factors.

deterrence—namely, compensating victims and forcing wrongdoers to surrender ill-gotten gains; the sanction of restitution is not excessive in relation to this intended alternative purpose. *Cf. United States v. Butler,* 137 F.3d 1371, 1371 (5th Cir.1998) (finding no merit in the defendant's claim that restitution awarded pursuant to the MVRA is disproportionate and excessive in violation of the Eighth and Fifth Amendments). The VWPA and MVRA ensure that victims recover the full amount of their losses, but nothing more. *See, e.g.,* 18 U.S.C. § 3663(b). Indeed, a victim's restitution award is reduced by any amount later recovered as compensatory damages for the same loss. *See* 18 U.S.C. § 3664(j)(2). Any deterrent or retributive effect of a restitution payment, therefore, is minimal in relation to the primary goal of aiding the victims of a defendant's criminal activity.

For all of these reasons, we hold that the restitution authorized by the VWPA (and mandatorily imposed under the MVRA) is not a criminal punishment for the purposes of the Ex Post Facto Clause. Newman therefore cannot satisfy the second requisite element of his ex post facto claim: that the district court applied the MVRA in a manner that retroactively increased his punishment for the instant criminal offense.

### 2. Calculation of the Restitution Order

In addition to challenging the district court's application of the MVRA, Newman argues alternatively that the court abused its discretion in calculating the amount of restitution at $11,973. The bank conducted its own internal audit and reported to the Government that Newman made off with $13,598. Only $1,625 of this amount was recovered around and inside Newman's house; the remaining $11,973 was never found. Newman admits that the trial court need only determine the amount of loss by a preponderance of the evidence, *see United States v. Menza,* 137 F.3d 533, 537 (7th Cir. 1998), but he argues that the bank's audit was wholly unsupported, unreliable, and compromised by a conflict of interest. He points out that the bank fired one of its employees for theft and implies that the bank may have inflated its loss calculation from his robbery in an effort to recoup some of these other stolen funds.

We review the district court's calculation of the amount of a restitution order for an abuse of discretion. *See, e.g., United States v. Martin,* 128 F.3d 1188, 1192 (7th Cir. 1997).[11] While the evidence supporting the court's determination of the bank's loss is admittedly based solely on the representations of the Government, we do not believe that the district court's restitution order in this case constitutes an abuse of discretion. The Presentence Investigation Report (PSI) makes three references to the amount of the bank's loss, most notably that "Mr. Newman took $13,598, of which $1,625 was recovered." In the section of the PSI discussing restitution, the probation officer stated: "Restitution in the amount of $11,973.00 is outstanding and payments may be forwarded to Bank One...." At the sentencing hearing, the Government explained that the basis for this calculation was an audit conducted by Bank One itself. The Assistant United States Attorney stated that the branch manager of Bank One conveyed this information to him. The audit itself was never introduced into evidence,[12] but hearsay testimony may be introduced at sentencing hearings to support a claim for restitution so long as the testimony has "sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3(a).

---

11. In this case, Newman initially forfeited his right to challenge the accuracy of the restitution order by failing to make a sufficiently specific objection at his sentencing hearing. His negligence, however, was absolved by the Government's failure to recognize his forfeiture of this argument—the infamous, if somewhat mis-named, "waiver of waiver" situation. *See, e.g., United States v. Leichtnam,* 948 F.2d 370, 375 (7th Cir.1991). We therefore review Newman's challenge under the abuse of discretion standard.

12. We assume this to be true because we could not find a copy of the audit in the record after a diligent search and because Newman's counsel objected to the lack of opportunity to verify the bank's audit. Also, if a copy of the audit had appeared in the record, we would have expected at least one of the parties to include a copy of this document in the appendix of its brief, as required by our Circuit Rule 30(b)(5).

Judge Hamilton concluded that the Government's proof of loss was reliable, especially in light of Newman's failure to challenge the evidence. When the PSI was submitted and the parties discussed the audit at the sentencing hearing, it was incumbent on the defense to request some more comprehensive or direct proof of the amount of loss, but Newman remained silent; he cannot now be heard to complain about the reliability of the information conveyed by the PSI and by the AUSA's proffer. After receiving the PSI, Newman filed two specific objections to the probation officer's determination of the total amount of loss. The first challenge related to USSG § 2B3.1(b)(7), which mandated an increase in Newman's base offense level if he caused a loss greater than $10,000. The second challenge concerned Newman's inability to pay restitution in *any* amount. In accordance with the Guidelines (USSG § 6A1.3) and our case law, *see, e.g., United States v. Pless*, 982 F.2d 1118, 1129 (7th Cir.1992), the district court accorded Newman an opportunity to elaborate on these challenges at the sentencing hearing. At the hearing, Newman sought only a clarification on whether the proposed loss figure included money that was allegedly strewn across the floor of the bank after the robbery or "whether they are claiming that 13,000 walked out of the bank". The Government stated that the loss figure did not include money lying on the bank floor, and the matter was never brought up again; apparently, the challenged inaccuracy focused completely on the inclusion of these alleged funds in the $13,598 loss figure, and the Government's answer apparently mollified Newman on this point. Newman's counsel certainly understood the importance of objecting to any other perceived errors in the restitution order inasmuch as she reiterated her objection to the order of *any* restitution at the end of the sentencing hearing.

Judge Hamilton assessed the reliability of the Government's representation and, in light of Newman's failure to impugn the claimed loss in any way,[13] considered the hearsay evidence as proof of the bank's loss. Newman did not offer up any sort of fight to the loss reported in the PSI and at the sentencing hearing aside from the challenge defused at the sentencing hearing regarding money on the bank floor. Under these circumstances, the district court did not abuse its discretion in accepting the Government's proposed amount of loss. We therefore affirm the district court's restitution order.

### C. Upward Departure

 Newman's final argument is without merit. He contests the district court's *sua sponte* application of an upward departure under USSG § 2B3.1(b)(4)(B), which authorizes a two-level increase "if any person was physically restrained to facilitate commission of the offense or to facilitate escape." The court reasoned that Newman's use of Toni Ashford as a human shield facilitated his escape from the crime scene. Newman argues that the restraint of Ashford did nothing to facilitate his crime or escape.

We need not reach the merits of this argument, however, because any error we might find would be harmless. *See* FED.R.CRIM.P. 52(a); *Williams v. United States*, 503 U.S. 193, 203, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992) ("[O]nce the court of appeals has decided that the district court misapplied the Guidelines, a remand is appropriate unless the reviewing court concludes, on the record as a whole, that the error was harmless, i.e., that the error did not affect the district court's selection of the sentence imposed."). The district court sentenced Newman to life imprisonment pursuant to 18 U.S.C. § 3559(c)(1), which requires a mandatory life sentence upon a third "serious violent felony" conviction. Section 3559(c)(1) rendered irrel-

---

**13.** We certainly recognize the difficulty in proving a negative proposition. It might have been difficult for Newman to *disprove* the bank's asserted loss, but it would not have been impossible; at the very least, he could have made a specific objection and offered some reason why the proposed figure was inaccurate. For instance, Newman could have cast doubt on the claimed loss figure by any number of methods: testimony concerning thefts by employees of the bank (as a way to suggest the loss figure was inflated to recover some of these funds), testimony by the bank tellers regarding the money they remember stuffing in Newman's duffle bag, and testimony from Newman himself swearing that he stole far less than the claimed $13,598.

**544**

evant any other sentencing determinations affecting the length of Newman's incarceration; whether or not the district court departed according to § 2B3.1 (or any or all other upward departures), Newman would still be consigned to serve the rest of his life in prison. He does not contest this life sentence, and we therefore need not address his claim of an erroneous upward departure in this case.

### Conclusion

For the foregoing reasons, we affirm Newman's conviction, his sentence of life imprisonment, and the district court's order of restitution.