UNITED STATES of America, Plaintiff–Appellee,

v.

Benjamin E. NATALINI, Defendant–Appellant.

No. 01–1463.

United States Court of Appeals, Tenth Circuit.

June 11, 2002.

Before EBEL, STEPHEN H. ANDERSON, and HENRY, Circuit Judges.

---

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

ORDER AND JUDGMENT *

STEPHEN H. ANDERSON, Circuit Judge.

Following a jury trial, Benjamin E. Natalini was found guilty of one count of armed robbery, in violation of 18 U.S.C. § 2113(a) and (b), and one count of use of a firearm in connection with a crime of violence, in violation of 18 U.S.C. § 924(c). He was sentenced to forty-six months imprisonment on the armed robbery count, and a consecutive eighty-four month sentence on the firearm count. We affirm his conviction and sentence.

## BACKGROUND

On April 16, 2001, Kelli Sue O'Bremski was working as a teller at the High Country Bank in Buena Vista, Colorado. Ms. O'Bremski testified that a man entered the bank at approximately 11:45 a.m. on April 16. Tr. of Proceedings in Hr'g on Mot. to Suppress ("Tr.") at 10, R. Vol. 2. He was wearing "brown colored bib overalls, light gray colored shirt with a black t-shirt over the top of that. All of that was under the bib overalls, which fastened with metal clasps." *Id.* at 11. He also wore a dark hat and orange-tinted goggles. *Id.* at 11–12.

Ms. O'Bremski testified that he then "approached my teller station as I was facing forward, facing him. He put a dark colored green backpack on my counter, and said, 'I need some money.'" *Id.* at 12. After she opened her teller drawer, the robber "reached in his bib overalls . . . and pulled out a gun." *Id.* at 12–13. Ms. O'Bremski testified that he held the gun "between himself and [me] in an angle towards the roof. I looked at the gun and noticed it was a long barrel revolver . . .

[with] white grips." *Id.* at 13–14. She stated that the robber then "cocked the hammer back on the back of the gun, and pointed it at me." *Id.* at 15. She gave the robber the hundred dollar bills and the fifty dollar bills that he asked for. Ms. O'Bremski observed that his "speech was slurred, or . . . thick tongue[d]." *Id.* at 16. As the robber exited the bank, Ms. O'Bremski activated the silent alarms and cameras. *Id.* at 18.

After the robber left, Ms. O'Bremski telephoned the Buena Vista Police Department. *Id.* at 24. At the time of the robbery, there were three other employees in the bank. *Id.* Officer James arrived at the bank "[b]etween five and ten minutes" after the robbery. *Id.* at 26. Ms. O'Bremski described the robber to Officer James, identifying his clothing and telling him that the robber was armed. *Id.* at 26–27.

Buena Vista Police Chief Tidwell then arrived at the bank. When he arrived, he learned that officers had already established a perimeter around a park north of the bank, towards which the robber had walked after he left the bank. *Id.* at 70. Residences surrounded the park.

Ms. O'Bremski knew Chief Tidwell "well," because her current and former husbands both were Buena Vista police officers. *Id.* at 30. She testified that "Chief Tidwell [gave] me a hug" and then "said that we needed to go to Leadville because they had stopped someone and he wanted me to look at the person that they had stopped." *Id.* at 31.

Ms. O'Bremski accompanied Chief Tidwell in his police car to Leadville, some 35 miles away. They traveled to Leadville "fast" with the car's siren activated. *Id.* at 32–33. Chief Tidwell testified that, while driving to Leadville, he "told Kelli that if this was our suspect, great. If it's not, great. We need to find out. I also left my perimeter set up." *Id.* at 72.

Upon arriving in Leadville, Chief Tidwell and Ms. O'Bremski went to the Lake County jail. There, Ms. O'Bremski, accompanied by Chief Tidwell, the Lake County sheriff, and Leadville police officer Jandegian, approached a cell containing an individual whom she recognized "[f]rom being in the bank earlier that day." *Id.* at 41. When asked how she identified him as the person who had robbed the bank earlier, she stated she "recognized that person by what he was wearing." *Id.* at 42. She described his attire in the cell as "brown bibbed overalls, a gray long sleeved shirt, a black t-shirt over the gray shirt." *Id.* Ms. O'Bremski further testified that, after he spoke to her, she recognized his voice as that of the robber: "[i]t was the same voice, the same speech pattern. . . . It was the same as the person that was in the bank with the slurred, thick tongue speech." *Id.* at 44. When asked her certainty as to her identity of the robber from both his speech and his appearance at the cell that day, Ms. O'Bremski testified twice she was "[a] hundred percent sure." *Id.* Natalini was the individual in the cell.[1]

Ms. O'Bremski was then taken to the Leadville Police Department, some four or five blocks from the jail. There, she was shown a gun and some money which had been taken from the individual in the cell.

---

1. Natalini had been apprehended following reports that an individual in a black pickup was driving erratically along the highway from Buena Vista to Leadville. When Natalini stopped his truck and was approached by police officers, one of the officers observed that "he [Natalini] had wads of money sticking out of his pocket and his bibs." Tr. at 90, R. Vol. 2. The officers also observed, and then confiscated, a long barreled pistol with "bone colored grips" which was concealed in Natalini's bibs. *Id.* at 91–92. He was arrested for carrying a concealed weapon, in violation of Colorado law.

She testified that she recognized the gun "[f]rom the bank.... It was the same color, barrel, it was the same long gun, it was a revolver, and it did have the white handles." *Id.* at 50. She also testified that she recognized a stack of hundred dollar bills "banded together by a rubber band" because "[t]hat is how I band my money in my teller drawer at the bank." *Id.*[2]

Ms. O'Bremski was subsequently escorted to the Leadville Police Department's impound lot where she was shown a black pick-up truck containing a hat and goggles she identified as being those worn by the robber of the bank. *Id.* at 56–57. Upon leaving Leadville, Chief Tidwell directed the termination of the perimeter.

On cross-examination, defense counsel elicited from Ms. O'Bremski that in her statement to the Buena Vista Police Department, Ms. O'Bremski had described the robber as having blonde hair. *Id.* at 62. Additionally, on another form filled out shortly after the robbery, Ms. O'Bremski described the robber as having hair of a "brown, light" color. *Id.* at 63. It is undisputed that Natalini had long dark hair at the time of the robbery. Ms. O'Bremski also stated in her police department statement that the robber weighed approximately 250 pounds. While the record is unclear as to Natalini's exact weight, there is some testimony suggesting he is not that heavy. *Id.* at 64.[3]

Before trial, Natalini moved to suppress, inter alia, Ms. O'Bremski's identification of him in the Leadville jail. After conducting a hearing, the district court denied the motion. Ms. O'Bremski testified at the trial and identified Natalini as the robber.

During trial, at the close of the government's case and after Natalini's motion for judgment of acquittal was denied, Natalini prompted his attorney, a federal public defender, to express his dissatisfaction with that attorney's representation of him: "It's my impression that Mr. Natalini is not pleased with me as an attorney. He does not feel he's prepared to go to trial. He wishes a new attorney. And he doesn't want to go to trial, or he's not ready to go to trial at this time." Tr. of Trial Proceedings at 415, R. Vol. 4. When questioned by the court, Natalini responded, "I feel my client/lawyer rights have been violated. I've been pressed into issues by her relating information to my parents and having them, plus her, press me into issues." *Id.* at 416. When asked what issues he had been "pressed into," he replied, "Just about taking a plea, how overwhelming evidence is. There's been lack of preparation for trial. As you will find out, we have no witnesses whatsoever. All avenues haven't been looked into in this case." *Id.* Natalini then indicated that he wanted a new attorney. Construing Natalini's request as a motion for a mistrial and new counsel, the district court denied it, stating "I believe that you've had an effective defense.... [F]rom what's been presented in the courtroom, I believe that your lawyer has put forth a spirited defense." *Id.*

Natalini raises two issues on appeal: (1) whether the district court erred in denying the suppression of Ms. O'Bremski's identification of Natalini; and (2) whether the district court erred in denying his motion for substitute counsel.

## DISCUSSION

### I. Suppression of Identification

Natalini argues the district court erred in denying his motion to suppress Ms.

---

**2.** Ms. O'Bremski also correctly predicted that the banded stack of bills would contain $1000, which was verified when the officers counted the stack. Tr. at 51, R. Vol. 2.

**3.** The presentence report lists Natalini's weight as approximately 207 pounds.

O'Bremski's identification both out of court and in court. He claims that the "show-up" identification at the jail was unnecessarily suggestive and it prejudiced Ms. O'Bremski's subsequent identification at trial.

" '[T]he ultimate conclusion of the constitutionality of identification procedures is a mixed question of law and fact' which is subject to de novo review." *United States v. Bredy*, 209 F.3d 1193, 1195 (10th Cir. 2000) (quoting *Archuleta v. Kerby*, 864 F.2d 709, 710 (10th Cir.1989)). We review for clear error the district court's factual findings. *Id.*

The district court denied Natalini's motion to suppress the identification, finding as follows:

This is not impermissibly suggestive. There is a plausible and very reasonable explanation for the police not taking extra efforts to have an array, either photo or lineup, because as the chief testified, he's got a situation where he doesn't know whether this person in custody is the true suspect. He's got the concern that somebody walked out of this bank with a gun. They set up this perimeter protection zone, and he's going to have to move as fast as he can for the safety of the citizenry of Buena Vista.

And, going through the factors ... under ... *Ne[i]l [v.] Biggers*, [409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) ], there was an adequate opportunity for the teller to observe this man at the time of the robbery. She had training in what to look for, and she certainly was focusing on the gun when she saw the gun, but I am certain that she paid attention to trying to identify the person in front of her.

There's some inaccuracies with respect to weight and perhaps height, but there are no inaccuracies with respect to the clothing description. And the cloth-

ing description is very important in this case, because the defendant is found in the same clothing. He's in jail in the same clothing. While ... bib overalls of that color is not ... uncommon in Leadville, ... the black t-shirt over the gray shirt is somewhat distinctive. And ... she looks at the defendant in the jail cell very shortly after the robbery, and certainly would have a pretty good image of him yet in mind. And she expressed certainty about her identification.

Tr. at 142–44, R. Vol. 2.

In determining whether a pretrial identification procedure was constitutional, "we first examine whether the procedure was unnecessarily suggestive." *Bredy*, 209 F.3d at 1195. If we conclude that the procedure was unnecessarily suggestive, we then consider "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *see also Bredy*, 209 F.3d at 1195. Thus, "we evaluate the reliability of the identification under the totality of the circumstances to determine whether the suggestive show-up 'created a substantial likelihood of irreparable misidentification.' " *Id.* (quoting *United States v. Thody*, 978 F.2d 625, 629 (10th Cir. 1992)). "Only when a pre-trial identification procedure is so unnecessarily suggestive that it is 'conducive to irreparable mistaken identification' does the procedure violate due process." *Grubbs v. Hannigan*, 982 F.2d 1483, 1490 (10th Cir.1993) (quoting *Kirby v. Illinois*, 406 U.S. 682, 691, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)).

The district court found the identification in this case was neither unnecessarily suggestive nor unreliable under the *Neil* factors.

With respect to the suggestiveness of the identification, we note that, in general, show-up identifications (those involving the identification of a single individual) are less than ideal. *See Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) ("The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."); *see also United States v. Funches*, 84 F.3d 249, 254 (7th Cir.1996) ("Show-up procedures have been widely condemned because of their potential to render unreliable, mistaken identifications."). Accordingly, such procedures "should be employed only if compelled by extraordinary circumstances." *United States v. Newman*, 144 F.3d 531, 535 (7th Cir.1998).

The government contends that such extraordinary circumstances existed in this case. The district court agreed with that assessment. We need not resolve that issue, however, because, even assuming that the show-up procedure employed was unnecessarily suggestive, we conclude that Ms. O'Bremski's identification of Natalini was reliable under *Neil v. Biggers*.

When resolving the "linchpin" question—the reliability of the identification—we consider five factors:

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil*, 409 U.S. at 199–200, 93 S.Ct. 375; *see also Bredy*, 209 F.3d at 1195–96. Applying those factors, we affirm the district court's conclusion that the identification was reliable.

First, Ms. O'Bremski had ample opportunity to view Natalini. She testified that she looked up and began watching him when he first entered the bank. He proceeded directly to her teller station and stood right in front of her, close enough to place the barrel of his pistol against her chest and close enough for her to hear him talk and identify his speech pattern. Ms. O'Bremski testified that the bank "is very well lit. We have a sky light right above the teller station." Tr. at 25, R. Vol. 2. The first *Neil* factor is accordingly satisfied.

Second, Ms. O'Bremski paid close attention during the robbery. She consistently gave a detailed description of the robber's clothing and weapon. She had the presence of mind to activate the silent alarm and cameras as the robber exited the bank. Although Ms. O'Bremski testified that she was nervous and worried for her safety during the robbery, the evidence clearly supports the district court's finding that "she paid attention to trying to identify the person in front of her." *Id.* at 143, 93 S.Ct. 375.

Third, Ms. O'Bremski's descriptions of the robber, given on numerous occasions, were detailed and consistent. She described the robber to police shortly after the robbery as wearing brown bibs, a gray long sleeved shirt underneath a black t-shirt, a hat and ski goggles, and carrying a gun. She gave a virtually identical description in her written statement to the police. When Natalini was arrested and identified by Ms. O'Bremski in the cell, he was wearing clothes matching that description. Natalini emphasizes the fact that there was some inconsistency in Ms. O'Bremski's description of the robber's hair, and some inaccuracy in her assessment of the robber's height and weight. He also relies heavily on the fact that neither Ms. O'Bremski nor the other tellers could identify Natalini in a photo line-up. But it is undisputed that the robber

wore a hat and goggles, thereby preventing any meaningful observation of his face and certainly hindering any observation of his hair. As the government points out, "[t]he linchpin in this case was the repetitive and consistent description of the defendant's clothing." Appellee's Br. at 17. Accordingly, the third factor supports the reliability of the identification.

Fourth, Ms. O'Bremski expressed no doubt or hesitancy in her identification of the robber. At the suppression hearing, she stated twice that she was "[a] hundred percent sure" of her identification. Tr. at 44, R. Vol. 2. She so testified again at trial, expressing complete certainty about her identification of the pistol, the hat and the goggles.

Finally, we must consider the length of time between the robbery and the challenged identification. In this case, Ms. O'Bremski identified Natalini approximately one and one-half to two hours after the robbery. While neither our court nor the Supreme Court have established any bright-line rules, the two-hour gap between the robbery and the identification is insufficient to cast doubt on the reliability of the identification, absent any other evidence creating such doubt.[4]

In sum, considering the five *Neil* factors, we affirm the district court's conclusion that Ms. O'Bremski's identification of Natalini was reliable.

## II. Denial of Motion for Substitute Counsel

Natalini argues the district court abused its discretion when it denied his mid-trial motion for substitute counsel. He also "requests a full evidentiary hearing regarding the legal representation he received at trial." Appellant's Opening Br. at 30. He asserts that "such a hearing will establish that his trial counsel failed to render effective representation, in violation of his sixth amendment rights." *Id.*

"We review a district court's denial of a motion to appoint substitute counsel for an abuse of discretion." *United States v. Anderson*, 189 F.3d 1201, 1210 (10th Cir. 1999). We have held that "[s]ubstitution-of-counsel standards are imposed by the Sixth Amendment and

> require that to warrant a substitution of counsel, the defendant must show good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict. The district court is under a duty to make formal inquiry into the defendant's reasons for dissatisfaction with present counsel when substitution of counsel is requested."

*Id.* (quoting *Johnson v. Gibson*, 169 F.3d 1239, 1254 (10th Cir.1999) (further quotations and citations omitted)).

■ Here, the district court asked Natalini to further explain his reasons for dissatisfaction with his attorney and Natalini's response was vague and insufficient to seriously suggest "good cause" for seeking substitution of counsel. We hold that the district court did not abuse its discretion in denying Natalini's motion for substitute counsel, and in declining to hold an evidentiary hearing on the matter.

---

4. Natalini suggests that two hours was ample time for the police to somehow improperly influence Ms. O'Bremski's identification or for them to clothe Natalini to match the description given of the robber. There is no evidence in the record supporting the latter suggestion. As to the former suggestion—that the police improperly influenced Ms. O'Bremski's identification—Natalini relies solely on the fact that Ms. O'Bremski spent the time between the robbery and the identification in the company of police officers and that she personally knew Chief Tidwell. Absent any evidence of attempts to improperly influence her, we will not presume such influence simply because the police accompanied her to the identification and she knew the police chief.

■ With respect to Natalini's claim, raised for the first time on appeal, that his trial counsel was ineffective, such claims "brought on direct appeal are presumptively dismissible, and virtually all will be dismissed." *United States v. Galloway,* 56 F.3d 1239, 1240 (10th Cir.1995) (en banc). "[O]nly in the very rare instance that a claim of ineffective assistance is fully developed in the record will we hear it for the first time on appeal." *United States v. Boigegrain,* 155 F.3d 1181, 1186 (10th Cir. 1998). This is not such a rare instance. We therefore decline to address it.

## CONCLUSION

For the foregoing reasons, we AFFIRM the denial of Natalini's motions to suppress Ms. O'Bremski's identification and to obtain substitute counsel. We AFFIRM his conviction and sentence.