In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1724

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ANGEL C. LOPEZ,

Defendant-Appellant.

Appeal from the United States District Court
for the Central District of Illinois.
No. 97 CR 20014--Michael M. Mihm, Judge.

Argued October 27, 1999--Decided August 17, 2000

Before FLAUM, Chief Judge, HARLINGTON WOOD, JR. and
EVANS, Circuit Judges.

HARLINGTON WOOD, JR., Circuit Judge.  Angel Lopez
("Lopez") pleaded guilty to conspiracy to
embezzle and misapply credit union funds and
conspiracy to execute a scheme to defraud. Lopez
was sentenced to thirty-eight months in prison
and to pay restitution in the amount of
$1,029,867. Lopez challenges the sentencing
determination and the amount of restitution. We
affirm.

I.  BACKGROUND

It is necessary to try to unravel the
convoluted and complicated transactions involved.
Credit Union One ("CU1") was a state-regulated
credit union incorporated under the laws of
Illinois, but also falling within the regulatory
authority of the National Credit Union
Administration ("NCUA"), which organizes and
approves federal credit unions. CU1 was federally
insured by the National Credit Union Share
Insurance Fund ("NCUSIF").

Lopez graduated from high school and began
working in the financial field in 1959. He was
hired by CU1 in 1976 as assistant general
manager. He was promoted to general manager in
1978. In 1979, his title was changed to
president. Less than a year later, Lopez became

a member of CU1's board of directors. All board members were required to sign an oath of fiduciary duty to act in the best interests of the credit union and to consider the interests of the credit union before their own personal interests. Board members were to receive no compensation for their services, other than reasonable and necessary reimbursement for expenses incurred while on official credit union business. The board of directors provided oversight and direction for the operation of the credit union, with the primary goal of offering high savings rates. To offset the higher savings rate, CU1 charged higher interest rates on loans. Unfortunately, this left a large pool of tempting cash.

Richard Binet ("Binet") was CU1's chairman of the board throughout Lopez's employment. Binet managed an investment portfolio of approximately $82 million on a yearly average from 1986 to early 1990. Lopez testified that he and Binet did not sit down and form an elaborate plan on how they would defraud CU1; it was basically an arrangement where Lopez and others supported Binet's actions and were consequentially rewarded by Binet. Lopez stated that anyone who objected to Binet's activity was quickly removed from the board. During his tenure as president, Lopez authorized at least $400,299 in direct and indirect consulting fees to Binet, in addition to authorizing CU1 purchases of two automobiles for Binet at a total cost of $40,644.

Binet had CU1's board contract with CUSI, Ltd., a corporation formed by Binet, which received payments totaling approximately $17,000 authorized by Lopez. According to Binet, the services CUSI was to provide were illusory and of no value. Lopez was also an officer of CUSI. After CUSI stopped receiving money for Binet, he created Credit Union Management, Inc. to receive CU1 money for his benefit.

Binet also had CU1 create a travel agency known as CU1 Travel. Lopez was listed as the "owner" of CU1 Travel and his wife as manager. Following an audit by Deloitte & Touche in 1989, travel agency losses of $141,231 were listed for 1988 and subsidiary losses of $25,539 for 1989.

Binet, after complaining to the board about the marketing efforts being made on CU1's behalf, proposed that Hana Advertising Associates, Inc. be given the marketing contract for CU1. The board agreed. During interviews with the FBI, after making a proffer (use immunity) agreement, Lopez stated that he knew Binet owned numerous companies, but that he (Lopez) was not involved in any of the companies. Although Lopez stated

that "he had no involvement with a company called
. . . Hanah [sic]," Hana Advertising was
incorporated under the laws of Illinois with
Binet listed as president and Lopez as a
director. Without the board's knowledge or
approval, Lopez ordered checks totaling
approximately $230,000 to be issued to Hana
Advertising from 1986 to 1987./1 Lopez stated
that he signed the contract and approved the
checks to Binet because "that [wa]s the way Binet
wanted it," and that Lopez's relationship with
the board was basically, "You scratch my back,
I'll scratch yours." Lopez stated that if Binet
left, Lopez knew his lucrative compensation
package/2 would be "seriously reduced."

Lopez also stated that he knew Binet owned or
controlled a company called Innovo, but did not
admit to any involvement with that company
either. However, Lopez later admitted to owning
a substantial amount of stock in Innovo Group
Inc., which was owned by Binet. Innovo received
a contract from CU1 in order to expedite the
purchase of plastic bags. Lopez eventually sold
his shares in Innovo, making a net profit of
approximately $100,000. Lopez also facilitated a
CU1 loan of approximately $100,000 to Innovo,
which was never paid back.

Having worked without a contract since 1976,
and being concerned about a retirement plan, in
1984 Lopez had his lawyer prepare an employment
contract which included a provision allowing
Lopez to retire after ten years of employment. If
Lopez exercised the retirement option, the
contract required CU1 to hire Lopez for a period
of not less than ten years as a "special
consultant" at an annual salary equal to fifty
percent of his highest annual salary earned while
president of CU1. The contract was self-renewing
every five years and specified Lopez could not be
terminated for "negligent or inadvertent
omissions or violations of regulatory rules or
laws." The board never reviewed or discussed this
contract. Under Binet's direction, the contract
was bought out in 1988 for $580,000, which the
government argued was approximately $300,000 more
than its true value.

Lopez also stated that dealing with Binet
became a necessity after Binet decided that CU1
should invest in collateralized mortgage
obligations ("CMOs")/3 and collateralized
mortgage obligation residuals ("CMORs")./4 Both
Lopez and Binet stated that Binet was the only
person at CU1 who had any knowledge of CMOs/CMORs
and that they and the board did not want to hire
an outside consultant who might recommend
needless transactions in order to increase
commissions. Lopez authorized payments to Binet

as an investment advisor in the amounts of $78,000 for 1988 and $45,500 for 1989.

Although Lopez continually denied awareness of or participation in a CMOR transaction with Binet for personal profit, Binet stated that in February 1988, he and Lopez used $8.8 million of CU1 money to purchase a CMOR, with CU1 owning eighty percent of the investment and Lopez and Binet owning twenty percent. Binet stated the CMOR was sold for a $1 million gain. He also testified that he had destroyed a fax from Lopez on June 6, 1988, which showed a portion of the money being returned to CU1. Lopez received part of his profits in the form of a "deferred compensation" payment of $250,000 orchestrated by Binet, and through the transfer of a universal life program insurance policy for Lopez which Binet had CU1 purchase in 1986. The policy, known as a "key man" policy, insured that if Lopez died, CU1 would own the cash flow from the policy. According to Binet, he had the ownership of the policy changed from CU1 to Lopez and Lopez was able to redeem the policy for a cash value of $265,000.

In February 1989, Lopez received notice that NCUA was going to conduct a review of CU1 in connection with CU1's status as an insured of the NCUSIF. NCUA has mandatory regulations concerning the buying and selling of CMOs and CMORs. As one of NCUSIF's insureds, CU1 had agreed to follow the NCUA regulations. After the review, NCUA notified Lopez of numerous concerns regarding the fact that CU1 had nearly fifty percent of its assets invested in CMOs/CMORs. CU1 agreed to sell fifty percent of the CMO/CMOR investments by December 31, 1989, and agreed to dispose of the remaining fifty percent by the following year. However, Binet and Lopez decided to seek private insurance in order to distance CU1 from NCUA examinations and federal regulations. Presented as a money-saving step, the board voted to terminate its share insurance with NCUA and sought private share insurance coverage with the National Deposit Insurance Corporation (now known as "ASI"). On February 11, 1990, the insurance conversion became effective and CU1 was relieved of its obligation to comply with NCUA's requirements.

During a joint examination of CU1 by ASI and the Illinois Department of Financial Institutions ("DFI") in February 1991, it was noted that CU1 was not acting on divesting the CMOs/CMORs. As a result, CU1 entered into a Letter of Understanding and Agreement with the DFI and ASI promising to engage a portfolio manager to assist in the pricing and sales of all the CMOs/CMORs and immediately cease payment of all compensation to the board of directors. Lopez admitted he

provided false information to the DFI regulators about the CMOs/CMORs.

Lopez was removed as president and as a director of CU1 in 1992 following an investigation by the DFI. On February 14, 1997, Lopez signed a proffer agreement which granted him use immunity for any information he provided which was relevant to the criminal activity engaged in while at CU1. Lopez was interviewed by government agents for three days and also assisted the government in locating and arresting Binet. On December 29, 1997, Lopez signed a plea agreement and on January 5, 1998, reviewed the plea agreement before the district court and pleaded guilty to conspiracy to embezzle and misapply funds belonging to CU1 and conspiracy to execute a scheme to defraud.

The court's sentencing calculations for fraud began with a base offense level of 6 under sec. 2F1.1(a) of the 1989 United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"),/5 with an 11 level increase incurred for a loss of $1,051,043./6 U.S.S.G. sec. 2F1.1(b)(L). Additional increases were applied as follows: 2 levels for more than minimal planning, U.S.S.G. sec. 2F1.1(b)(2)(A); 2 levels for abuse of a position of public or private trust and use of his position which "significantly facilitated the commission or concealment of the offense", sec. 3B1.3; and 2 levels for obstruction of justice when testifying untruthfully before the grand jury about the CMOR, sec. 3C1.1 comment. n.1(c). These additions created an adjusted offense level of 23. A 2 level downward adjustment for acceptance of responsibility under sec. 3E1.1 comment. n.4, was also made, which resulted in a total offense level of 21. With no prior criminal history, Lopez's Guideline range for sentencing was thirty-seven to forty-six months. U.S.S.G. sec. 5A. The district court sentenced Lopez to thirty-eight months incarceration, and, under the Mandatory Victim Restitution Act of 1996 ("MVRA"), ordered restitution to CU1 in the amount of $1,029,867./7

Lopez contends that the district court erred on eight issues: (1) by violating the immunity proffer to enhance Lopez's sentence, (2) by enhancing his sentence for obstruction of justice, (3) by using gain to Binet as a substitute for loss where there was no loss to the victim, (4) by basing the estimated gain on unreliable and contradictory evidence, (5) by determining an arbitrary value for services rendered by Binet, (6) by failing to reduce the Guideline losses by the value of the cars recovered by CU1, (7) by enhancing the loss figure with bonuses paid to certain CU1

employees, and (8) by violating the Ex Post Facto Clause in applying the MVRA.

II. ANALYSIS

A. Violation of Immunity Agreement

Lopez argues that the February 1997 proffer agreement providing use immunity prohibited the district court from using any information about the personal CMOR transaction in Lopez's sentencing. The terms of the immunity agreement provide:

[N]o statement made or information provided by [Lopez] pursuant to this agreement may be used directly against your client in any criminal case, including sentencing . . . . [Lopez] will provide complete and truthful information . . . regarding his criminal conduct and everything he knows or has reason to believe about the criminal conduct of others. . . . Should [Lopez] knowingly make any materially false statement or omission in providing information under this agreement, the government will be entitled to use his statements and evidence he provides directly to institute and support a criminal prosecution for any offense as well as a prosecution for giving false statements and perjury. . . . [Lopez] must neither conceal or minimize his own actions or involvement in any offense, nor conceal, minimize, fabricate, or exaggerate anyone else's action or involvement in any offense. He must be completely truthful about the facts whatever those may be.

(Emphasis in original.)

After signing the proffer, Lopez testified before government agents and the grand jury that Binet supervised the CMO/CMOR investments for CU1. He stated that when Binet approached him to purchase a CMOR with CU1's money for their own profit, he refused to participate in such an action and had no idea if Binet ever did so. Binet later testified that he and Lopez made such an investment, that Binet had had records of Lopez's participation which he had since destroyed, and that Lopez personally benefitted from the transaction. In addition, Lopez failed to mention the fact that he had conspired to alter the minutes of the board meetings, although the minutes were discussed with the government and Lopez knew the government was relying on the minutes in its investigation.

"As a contract, a proffer agreement must be enforced according to its terms." United States v. Cobblah, 118 F.3d 549, 551 (7th Cir. 1997) (citation omitted). As in Cobblah, the proffer "contract" obligated Lopez to give statements

that were entirely truthful. See id. The proffer emphasized that Lopez should not seek to conceal or minimize his own actions in the offenses involved and clearly stated that any false statements or omissions could then be used against him. Given the language of the proffer, the government was within its rights to consider the proffer agreement had been voided due to Lopez's omissions concerning the CMOR and the alteration of the minutes. See id. We cannot say the district court erred in its determination that the government had established, by a preponderance of the evidence, that Lopez did know about the CMOR used for his and Binet's personal profit and that Lopez concealed the fact that he and others changed the board minutes. See id. Lopez violated the terms of the proffer, making it unenforceable.

Furthermore, in his plea agreement, signed December 29, 1997, ten months after the proffer, Lopez admitted to the following:

On April 20, 1988, the defendant and Richard Binet caused $8.8 million of CU1 funds to be used to purchase a CMO residual with CU1 owning 80% of the investment and the defendant and Binet owning 20% of said investment. Said use of CU1 funds was never made known to the Board of Directors and the defendant knew that individuals were not entitled to own REMIC/8 investments. When said investment was sold for a $1 million gain, the defendant knew that the benefit was not provided to CU1. The defendant himself did not take any of these funds directly but benefitted from a $250,000 cash payment under the heading of Deferred Compensation Plan. Further, the defendant benefitted when a life insurance policy which had originally been purchased by CU1 as a key-man policy, beneficiary of which was to be CU1, was transferred to him personally.

Lopez also admitted in the plea agreement that he conspired to alter the minutes of the board meetings. The plea agreement also stated that the government was requesting a 2 level enhancement for obstruction of justice, based on Lopez's failure to fully disclose the CMOR transaction and his failure to disclose alteration of the minutes.

Lopez discussed the terms of the plea agreement with the district court at the plea hearing. Lopez stated that the plea agreement represented "every understanding" he had with the government and that he understood the terms of the plea agreement. Lopez cannot invoke the proffer after agreeing to the admissions and terms set forth in the plea agreement.

B.  Obstruction of Justice

The Guidelines provide for an increase of 2 levels if the offender obstructed justice during the investigation or prosecution of his offense. U.S.S.G. sec. 3C1.1./9 The plea agreement states that "[p]ursuant to sec. 3C1.1, the defendant may receive 2 points for obstructing or impeding the administration of justice during the investigation or prosecution of the instant offense . . . ." More specifically, the plea agreement notes that because Lopez admitted his guilt after being confronted with evidence that he caused the minutes to be altered, he would fall into a sentencing category under sec. 3E1.1 comment. n.4, which allows for both an obstruction of justice and an acceptance of responsibility adjustment to be applied. Lopez also admitted in the plea agreement to knowledge of the CMOR transaction Binet engineered and to receiving personal benefits from the profits of that transaction.

"To establish an obstruction of justice, the sentencing court must make an independent factual finding that the defendant engaged in a willfull attempt to provide false testimony." United States v. Sinclair, 74 F.3d 753, 762 (7th Cir. 1996) (citing United States v. Dunnigan, 507 U.S. 87, 93-96 (1993)). This finding may be reversed only if clearly erroneous. Id. (citation omitted). Based on the evidence of Lopez and Binet's intertwined dealings, the substantial amounts of money funneled to Lopez, and the testimony of Binet about both the minutes and the CMOR, the court determined that Lopez had willfully withheld information about material facts. The court stated, "I . . . believe there were things you didn't tell them that you were aware of and should have told them and didn't until they were discovered somewhere else . . . ." Given these findings, we cannot say the district court's conclusion that Lopez's testimony was intentionally withheld, and not the result of confusion, mistake, or faulty memory, was clearly erroneous. See id. Moreover, because the district court recognized this finding was a factual determination based in large part on an issue of credibility, such credibility determinations "can virtually never be clear error." United States v. Hickok, 77 F.3d 992, 1007 (7th Cir. 1996) (quoting Anderson v. Bessemer City, 470 U.S. 564, 575 (1985)); see also United States v. Fiore, 178 F.3d 917, 924 (7th Cir. 1999). We also note that the court's enhancement for obstruction of justice is not incompatible with a reduction for acceptance of responsibility. See United States v. Buckley, 192 F.3d 708, 711 (7th Cir. 1999); United States v. Ramunno, 133 F.3d 476, 480 (7th Cir. 1998); United States v. Lallemand, 989 F.2d 936, 938 (7th Cir.

1993).

C.  Gain as Substitute for Loss

Lopez argues the district court erred in using the estimated profit made on the CMOR transaction by his co-conspirator Binet towards Lopez's sentence, even though the court determined that there was no "actual loss" to CU1 because the $8.8 million "borrowed" from CU1 was returned, albeit with some (but not all) profit made on the transaction. Lopez refers us to Application Note 8(b) to U.S.S.G. sec. 2F1.1 which, he asserts, provides that a loss figure should be reduced "by the amount the lending institution has recovered or can expect to recover." There is no such language in the 1989 Guidelines. This section first appears in the 1991 Guidelines, sec. 2F1.1 comment. n.7(b), which deals specifically with fraudulent loan application and contract procurement cases, and pertains to a defendant who understates debt information to obtain a loan./10 There is no language in sec. 2F1.1 of the 1989 Guidelines which requires the district court to offset the amount of loss, although comment. n.10 does allow for consideration that a total dollar loss may overstate the seriousness of a crime when "understating debts to a limited degree in order to obtain a substantial loan which the defendant genuinely expected to repay . . . ." However, this language is not applicable to the instant case, where Binet and Lopez did not manufacture a "fraudulent loan" scheme but simply took and used CU1's money outright.

Under sec. 2F1.1 comment. n.8 of the 1989 Guidelines, "The offender's gross gain from committing the fraud is an alternative estimate that ordinarily will understate the loss." Section 2F1.1 "allow[s] the defendants' gain to be used as a basis for calculating an approximate loss when evidence of the exact amount of loss is not available." United States v. Andersen, 45 F.3d 217, 221 (7th Cir. 1995).

While the meaning of loss under sec. 2F1.1 presents a question of law subject to de novo review, United States v. Holiusa, 13 F.3d 1043, 1045 (7th Cir. 1994), the district court's finding on the amount of loss is reviewed for clear error only. United States v. Dillard, 43 F.3d 299, 309 (7th Cir. 1999).

Lopez argues that because the $8.8 million was returned to CU1, there was no loss. He does not deny the misapplication of funds for the CMOR occurred. Lopez also maintains that because Binet supervised and benefitted the most from the transaction, he should not be held accountable for Binet's gain. Lopez admitted in his plea

agreement that he conspired with Binet to embezzle, misapply, and defraud funds from CU1. Section 1B1.3 comment. n.1, states:

In the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant "would be otherwise accountable" also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant.

Binet testified this particular CMOR transaction was purportedly made on behalf of CU1, but that twenty percent of the profit was to go to Lopez and to him. He also testified that Lopez was involved in helping to transfer and receive the monies. The transfer of $8.8 million of CU1 funds was documented by the government. Therefore, any estimated profit which Binet made on the investment was correctly determined to be a loss to CU1. Binet's profit from this particular transaction would not have been realized without his illegal use of CU1's funds. See United States v. Marvin, 28 F.3d 663, 665 (7th Cir. 1994). The profits were "intertwined with and an ingredient of [defendant]'s overall fraudulent scheme." See id. Additional punishment is merited where sufficient evidence provides for determination of monetary loss. See United States v. Schneider, 930 F.2d 555, 559 (7th Cir. 1991).

The district court did not clearly err, based on Binet's statements that Lopez was involved in this particular CMOR transaction, and Binet's testimony, along with Lopez's testimony and evidence in the record concerning benefits received by Lopez, in determining that the estimated profit from the CMOR transaction should be applied as a factor in Lopez's sentencing.

D. Estimated Gain Based on Unreliable Evidence

"Generally, the defendant's gain may provide a reasonable approximation of a victim's loss, and may be used when more precise means of measuring loss are unavailable." Andersen, 45 F.3d at 221. The amount of loss sustained by a victim must be established by a preponderance of the evidence. 18 U.S.C. sec. 3664(d). In determining a sentence under the Guidelines, the court has an "obligation to employ fair procedures to determine the accuracy of information used in sentencing." United States v. Franz, 886 F.2d 973, 980 (7th Cir. 1989); see also United States v. Agyemang, 876 F.2d 1264, 1270 (7th Cir. 1989). "[T]he court properly discharge[s] its obligation under sec. 2F1.1 of the Sentencing Guidelines by reducing the available information to a 'reasonable estimate' of the loss." United States

v. Haddon, 927 F.2d 942, 952 (7th Cir. 1991); U.S.S.G. sec. 2F1.1 comment. n.8. "Every factual inaccuracy does not amount to a constitutional violation." Franz, 886 F.2d at 980 (citations omitted). The burden of proof on appealing a district court's loss calculation requires the defendant to show that the determination "was not only inaccurate but outside the realm of permissible computations." United States v. Hassan, 211 F.3d 380, 383 (7th Cir. 2000) (quoting United States v. Jackson, 25 F.3d 327, 330 (6th Cir. 1994)).

Based on calculations from incomplete documentation concerning the CMOR transaction,/11 Binet stated that he believed he, through his company, Credit Union Mortgage, had received $1,360,000. He said, "I don't know the exact amount, but it was at least a million." He also stated that he was certain that he had received $800,000 because he used that amount to fund Innovo, his company in Texas. Lopez argues that because Innovo's annual report listed a "debt" balance of $413,754 during the relevant period when Binet was siphoning off his profits from the CMOR, that is the amount that should be considered Binet's profit. Binet also testified that he recalled approximately $600,000 had been funneled into Innovo by the time it went public. Although the district court noted that Binet "had a lot of things going on at that same time . . . that he was the man in terms of all of this movement of money from one place to another, and I'm not sure that it's totally clear in his mind what he did," the court believed Binet had "made an effort to be truthful in his testimony."

To the extent that the district court's findings rest on credibility determinations, they command even greater deference than ordinary factual findings. Fed.R.Civ.P. 52(a); see Johnson v. Zerbst, 327 U.S. 106, 111-12 (1946). This court may not re-judge credibility and may reverse only if, after reviewing the record, we are left with the firm belief that the district court made a mistake. Zeige Distributing Co., Inc. v. All Kitchens, Inc., 63 F.3d 609, 612 (7th Cir. 1995) (citation omitted). "Congress has mandated this deferential standard of review, see 18 U.S.C. sec. 3742(e), and we do not second-guess the sentencing judge." United States v. McEntire, 153 F.3d 424, 431 (7th Cir. 1998) (citations omitted).

The district court calculated the estimated profit at $600,000. This amount was arrived at after hearing Binet testify at an alleged co-conspirator's trial, in addition to three separate sentencing hearings. The court reviewed all of the available documentation concerning the

CMOR during the three sentencing hearings and asked questions of both parties in seeking to reconcile the documentation with the testimony. The record indicates the district court's inquiries were sufficiently searching to ensure the probable accuracy of the available evidence. See United States v. Beler, 20 F.3d 1428, 1443 (7th Cir. 1994). The district court judge stated repeatedly that "Mr. Binet has been credible in his testimony." Although the district court stated there was sufficient evidence to support a finding of $800,000 or more, the court reduced the amount of loss to $600,000, given the "grossly incomplete" records of the CMOR transaction. The court noted the $413,754 loan amount but, from the documents and testimony, believed the profit on the $8.8 million CMOR to be more than that.

We are satisfied the district court "correctly applied the guidelines to findings of fact that do not leave us with the definite and firm conviction that a mistake has been committed." United States v. Jordan, 890 F.2d 968, 972 (7th Cir. 1989). Based on the evidence available, the district court did not clearly err in determining the estimated profit loss to CU1 was $600,000 on a CMOR transaction involving $8.8 million and in applying that amount to Lopez's sentence.

E.  Arbitrary Determination of Binet's Services

Binet received $399,500 during the four years he managed CU1's investment portfolio. Lopez argues the entire amount should be deducted from CU1's losses because the portfolio earned money during every year in question and Binet was worth that much in managing a portfolio of approximately $82 million on average. Of course, this amount was "paid" to Binet through Lopez's manipulations and without the board's knowledge.

The government proposed an offset based on the annualized investment fees for 1988 and 1989, $27,833.60 and $17,858.01 respectively, but divided the figures in half to take into account the amount of time Binet spent "working" at CU1 for personal gain. The defendants proposed fees based on percentage points of the total of net investments for each year, resulting in calculations of approximately $300,000 for 1988, $353,000 for 1989, and $428,000 for 1990.

The district court followed Schneider in determining that there should be a certain offset where the defendant provides a service. See 930 F.2d at 558./12 However, as the government noted, when the NCUA, DFI, and ASI came in, they all agreed that CU1 was not being managed well and was involved in numerous questionable

investments, in addition to the embezzlement and fraud later discovered. After hearing Binet's testimony, the district court noted the difficulty in quantifying an amount for Binet's services to CU1 in the absence of any records because Binet had so many "projects" going on, it was difficult to separate the time spent on legitimate CU1 investment business.

Binet was not a certified or licensed investment broker or manager nor was he registered with the SEC. The board was never given the opportunity to determine what they might wish to pay him or someone else. The court was concerned that Binet was not licensed as an investment manager and that he involved CU1 funds in higher risk investments, both factors which lowered the value of the services rendered.

The district court's determination of loss under sec. 2F1.1 (b)(1) of the Guidelines is a finding of fact reviewable for clear error only. United States v. Strozier, 981 F.2d 281, 283 (7th Cir. 1992). The district court noted that testimony indicated most credit unions do not have salaried investment managers, as was the case with CU1. The court then determined the offset to be one-fifth of the $399,500 (the amount Binet had chosen to "pay" himself); that is, $79,900 for the four-year period. Because there are no precise figures, as in Schneider, where the difference between the contract price and the contractor's costs was used as the measure of damages rather than the full contract price, 930 F.2d at 558, the district court, after hearing methods of calculations from both parties, determined the amount based on a percentage of Binet's self-remuneration.

We agree that Binet's services should not be calculated on a par with a licensed professional who does not commit embezzlement or fraud with a client's money. Given the annualized investment fees of $27,833.60 for 1988 and $17,858.01 for 1989, the district court's fee of $19,975 per year is a "reasonable estimate," Haddon, 927 F.2d at 952, and is not "outside the realm of permissible computations." Hassan, 211 F.3d at 383 (citation omitted).

F.  Failure to Reduce Loss by Value of Cars

Lopez makes the same argument here he used in opposing Binet's gain as a measure of loss, again referring us to "Application Note 8(b) to U.S.S.G. sec. 2F1.1" which is not found in the 1989 Guidelines. We repeat, that note is not applicable to the instant case.

The court stated that the loss amount for

sentencing was determined by the original capital outlay for the two cars because the defendants had no right to purchase the vehicles with CU1 funds. There is no dispute that the original expenditures for the two cars were $20,767 and $19,877. Lopez argues that the trade-in and/or resale value of each car should be deducted from the loss amount. The district court did deduct the trade-in/resale values from the restitution amount, but stated that "the loss was determined by the amount of [CU1] money that was expended to purchase these items or lease them . . . ." The district court did not clearly err in using the purchase price of the cars for sentencing purposes.

G.  Employee Bonuses

Binet testified that in February 1990 a payment of $13,852 was made to Charles Wiseman, an employee of CU1. Both Binet and Lopez testified that Wiseman and several other employees assisted in the cover-up of irregularities at CU1 prior to obtaining private insurance. Lopez testified that these bonuses were approved by the board. Although Lopez stated that most or all employees received annual bonuses, the bonuses for these particular employees (and only these employees) were issued on February 28, 1990. The insurance conversion became effective on February 11, 1990. The government maintains the timing of the bonuses to these particular employees indicates the payments were payoffs for assisting with the fraud.

Minutes of the board meetings from December 1986, December 1987, and December 1989 state that employee year-end bonuses were authorized at those times. The district court found that the people involved and the timing indicated the payments were directly related to the change in insurance. We cannot say the district court committed clear error in making this determination.

H.  Restitution Ex Post Facto Claim

Lopez argues that ordering restitution under the MVRA, 18 U.S.C. sec. 3663A,/13 which requires restitution be ordered "without consideration of the economic circumstances of the defendant," 18 U.S.C. sec. 3664(f)(1)(A), violates the Ex Post Facto Clause of the Constitution, Art. I, sec. 9, cl. 3. He asks us to overrule our holding in United States v. Newman, 145 F.3d 531, 537 (7th Cir. 1998) (finding that the MVRA applies to cases in which a defendant is convicted on or after April 24, 1996, the date of the enactment of the MVRA, even though the criminal conduct may have occurred prior to April 24, 1996).

Congress amended the Victim and Witness Protection Act ("VWPA") in 1996 in an effort to guarantee restitution to the victims of criminal conduct. See Newman, 145 F.3d at 537. The Ex Post Facto Clause prohibits the enactment of a "law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." Calder v. Bull, 3 U.S. 386, 390 (1798). In Newman, we held that restitution does not qualify as criminal punishment. 145 F.3d at 538; see also United States v. Black, 125 F.3d 454, 467 (7th Cir. 1997). We observed in Newman that other courts disagree with this finding and the Eighth Circuit, in particular, does not agree with our characterization of restitution under the VWPA. Id. at 539.

Lopez notes the split in the circuits on this issue and asks us to adopt the argument of the Tenth Circuit in United States v. Nichols, 169 F.3d 1255 (10th Cir. 1999). His argument is misplaced, as Nichols states, "[W]e accept the view of the Seventh Circuit [in Newman] that the Ex Post Facto Clause does not bar application of the MVRA to a defendant whose criminal conduct occurred before the effective date of the statute and reject the views of the Second, Third, Eighth, Ninth, Eleventh and D.C. circuits to the contrary." 169 F.3d at 1280 n.9.

We decline to reconsider the holding in Newman.

III.  CONCLUSION

Based on the above-stated reasons, we affirm the findings of the district court.

/1 Although several checks were issued in 1986, the marketing contract was signed on May 16, 1987 and terminated in December 1987. According to Lopez's testimony, Binet instructed Lopez to use the name Hana Advertising on the 1986 checks for Binet's "work performed," even though Binet had not yet created the contract using Hana Advertising's name. However, Lopez testified that the checks had actually been written to Binet, but the IRS 1099 forms were issued in the name of Hana Advertising.

/2 Lopez's W2 form for 1989 listed $182,727 as his annual salary.

/3 According to Barron's Business Guide Dictionary of Banking Terms 127-28 (Thomas P. Fitch et al. eds., 1990), a CMO is a:

mortgage-backed bond secured by the cash flow of a pool of mortgages. In a CMO, the regular principal and interest payments made by borrowers are separated into different payment streams, creating several bonds that repay invested capital at different rates. . . . A CMO pays the bondholder on a schedule that differs from the mortgage pool as a whole, and includes fast pay, medium pay, and slow pay bonds to suit the needs of different investors. The common arrangements include: a fast-pay bond with a maturity much shorter than the total pool; a bond paying interest only for a period that may be fixed or contingent on how prior CMOs perform, before payment of principal begins; and a bond paying variable interest based on an index . . . . Fast paying bonds appeal mostly to savings and loans seeking short-term liquidity investments, whereas longer-term CMOs appeal to the investment needs of pension funds and institutional investors. . . .

/4 Barron's Business Guide Dictionary of Banking Terms 524, states that a CMO residual is:

cash flow resulting from the difference between the income stream generated by a pool of mortgages and the cash flow necessary to fund a series of collateralized mortgage obligation bonds. Also known as equity.

/5 The record states that the 1989 edition of the Guidelines has been used to compute sentencing for the crimes, which were committed from July 1984 through February 1990.

/6 The figure was derived from: profit from contract buyout-$37,000; CMOR-$600,000; overpayment to Binet through CUSI-$17,000; overpayment to Binet through Hana Advertising-$230,799; direct payments to Binet-$78,000 and $45,500; bonuses paid to CU1 employees-$36,000; and purchase of cars for Binet-$40,644, totaling $1,130,943, less an offset for the value of Binet's services rendered to CU1 as determined by the district court to be $79,900, resulting in a final total of $1,051,043.

/7 This amount was derived from the $1,051,043 total, less an offset of $21,176 for the trade-in and resale value of the two cars purchased for Binet.

/8 A real estate mortgage investment conduit ("REMIC") is a "mortgage securities vehicle authorized by the Tax Reform Act of 1986 that holds commercial and residential mortgages in trust, and issues securities representing an undivided interest in these mortgages. . . . similar to a collateralized mortgage obligation

(CMO) . . . ." Barron's Business Guide Dictionary of Banking Terms 497. Most of the parties involved in the case did not understand the exact nature of each of the investments involved and tended to use CMO, CMOR, and REMIC interchangeably.

/9 U.S.S.G. sec. 3C1.1 (1989) states, "If the defendant willfully impeded or obstructed, or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the instant offense, increase the offense level by 2 levels." /10 This language appears in sec. 2F1.1 comment. n.8(b), of the most current Guidelines (1998).

/11 Neither party was able to obtain complete records from the banks involved, in part due to the lapse of time between the transaction dates in 1987-88 and the filing of the indictment in March 1997. Also, according to Binet, most of the CU1 documents on this particular CMOR transaction were diverted to him and were later destroyed. In addition, information about this transaction did not come to light until after Binet's arrest in 1997.

/12 We note that Schneider limits this "offset" calculation of loss to fraud cases "where the fraud is discovered or otherwise interrupted before the victim has been fleeced." 930 F.2d at 558. The fraud in the instant case was not interrupted or discovered prior to completion of the criminal activity. However, the government does not argue that Binet should not receive an offset for his services; there is no challenge to the offset itself, only to the amount.

/13 Lopez mistakenly refers to the MVRA as 18 U.S.C. sec. 4663A et seq.