# In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-1526 & 09-1615

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KATHERINE CHRISTIANSON AND BRYAN RIVERA,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 08 CR 107—**Barbara B. Crabb**, *Chief Judge.*

ARGUED SEPTEMBER 24, 2009—DECIDED NOVEMBER 9, 2009

Before POSNER, MANION, and TINDER, *Circuit Judges.*

MANION, *Circuit Judge.* In the summer of 2000, defendants Katherine Christianson and Bryan Rivera were members of the Earth Liberation Front, identified by the FBI as a domestic eco-terrorist group. Besides attending meetings and protests, they also found time to destroy several research projects at a U.S. Forest Service facility in Rhinelander, Wisconsin. They were not

prosecuted until eight years later when they were indicted for and pleaded guilty to destroying government property. The district court sentenced Christianson to 24 months' and Rivera to 36 months' imprisonment respectively; both sentences were substantially lower than the recommended guideline range but the government does not contest them. On appeal, the defendants challenge the district court's loss-amount calculation; Rivera also argues that the district court erred in applying the terrorism enhancement. We affirm.

## I.

In July 2000, Katherine Christianson went to the Earth First! Rendevous in Tennessee with her then-boyfriend of several years, Ian Wallace.[1] There they met

---

[1] As noted in the pre-sentence report submitted to the district court, Earth First! is an environmental advocacy group that emerged in the southwestern United States in the late 1970s. It holds annual meetings, or Rendezvouses, to discuss environmental issues. During its early years, much of its activities involved peaceful "sit-in" type protests. But in the late 1980s its focus shifted to "direct action," including criminal activity to combat forms of development that they associated with the destruction of wildlife habitats. This changed emphasis attracted many new members, some with anarchist political backgrounds. In the early 1990s, Earth First!'s focus again shifted as it became a mainstream movement. And the members who refused to abandon criminal activity and

(continued...)

Daniel McGowan and Bryan Rivera. During the Rendevous, the four discussed vandalizing the U.S. Forest Service ("Forest Service") facility in Rhinelander, Wisconsin, where the Forest Service was conducting several genetic-engineering experiments on trees.

After the Rendevous, the four traveled to Minneapolis, Minnesota, to demonstrate at the International Society of Animal Genetics conference. During their time at the conference, they traveled to Rhinelander and conducted reconnaissance of the facility. After seeing the site, they determined that four people would be needed to effectively carry out their mission. Needing a fifth person to act as a driver, Wallace recruited a friend from high school.

On the night of July 20, 2000, the four entered the facility and damaged or destroyed more than 500 trees, either by cutting them down or by girdling them. Girdling, or as it is more commonly known "ring barking," consists of completely removing a strip of bark around a tree's outer circumference, causing the tree's eventual death. XIII *Oxford English Dictionary* 958 (2d ed. 1989). In addition to destroying the trees, they used etching cream and spray paint to leave their "calling card" on several Forest Service vehicles. The group, however, had to cut short its sortie after fearing they would be discovered by a security guard. Although they left

---

[1] (...continued)
take up a petition formed a militant off-shoot called the Earth Liberation Front.

in haste, they were careful to dispose of their clothes and tools on the way back to Eau Claire, Wisconsin, where they dropped off their driver before returning to Minneapolis.[2]

The next day, Christianson and McGowan issued a press release in the name of the Earth Liberation Front ("ELF") and on behalf of native forests everywhere. In the communique, they claimed responsibility for the attack and admonished their allies

> to cease quibbling with the Forest Service over details of their genocidal plans . . . . The sooner we realize that the Forest Service, like industry, are capitalists driven by insane desire to make money and control life, the better. Than [sic] we can start taking more appropriate action.

What they meant by "more appropriate action" is not clear, but from ELF's other attacks, it could be read as foreshadowing further acts of violence against the Forest Service. From there, the case went cold.

Eventually, in January 2007, Wallace was implicated in an attempted bombing on the campus of Michigan Tech University. He subsequently cooperated with the authorities and shared the details of the attack on the Rhinelander facility. Christianson and Rivera were ultimately indicted and pleaded guilty to willfully injuring property belonging to the United States, causing damage

---

[2] The driver, Aaron Ellringer, pleaded guilty to a misdemeanor and was sentenced to four days of incarceration.

greater than $1000, in violation of 18 U.S.C. §§ 2 and 1361. The government initially estimated the loss amount was between half a million and a million dollars.

At sentencing, Christianson challenged the loss calculation. To support its position, the government called Don Riemschneider to testify; he was a research plant scientist at the Rhinelander facility in the summer of 2000. After the attack, Riemschneider had prepared a report for his supervisor and the FBI on the damage from the attack. In it, he estimated a total loss amount in excess of $420,000 based on the damage caused to the Western Black Cottonwood ("Cottonwood") experiment and an advanced generation clone experiment that was destroyed. For various reasons, he did not include estimates for any of the other experiments that were destroyed by the defendants. At sentencing, he produced his report and repeated his initial estimates, further explaining their bases. He estimated that to replicate the Cottonwood experiment it would cost $400,000. He based this total on the project's costs between 1983-1993, when it was most active; during those years he estimated the project cost at $40,000 per year. In support of this total, he cited three specific expenses that made up the bulk of the costs: the gathering of samples for the experiment, the costs of maintaining the experiment and the cost of hiring a technician to assist in collecting measurements during two years of the experiment. Riemschneider also stressed that this amount was calculated using costs between 1983-1993, and it would be much higher today. He also added that funding for the project was discon-

tinued in 2000; it is unclear whether the defendants' conduct had anything to do with that decision.

After hearing Riemschneider's testimony and the arguments of counsel, the district court adopted Riemschneider's estimate of $424,361 as the loss amount attributable to Christianson's conduct, noting this was "a very very conservative [estimate] and lower than what was actually experienced." It also found that Christianson's crime was among those listed in the terrorism enhancement under U.S.S.G. § 3A1.4 and that she committed those acts to influence or affect the conduct of government by intimidation or coercion. The application of the terrorism enhancement automatically raised her offense level to 29, with acceptance of responsibility, and her criminal history to a Category VI. Her guideline range was then calculated at 151-188 months. After consulting the factors at 18 U.S.C. § 3553, the district court sentenced Christianson to 24 months in prison.

The same district court sentenced Rivera. At sentencing, Rivera agreed to the loss amount calculated at Christianson's hearing but argued that the terrorism enhancement was inapplicable. The district court overruled his objection. He had the same guideline range as Christianson: 151-188 months. But after noting his lack of an apology or some form of regret, the district court sentenced him to 36 months' imprisonment.

## II.

On appeal, both defendants challenge the district court's loss findings. Their argument is two-fold. First, they

contend that the Forest Service did not suffer a loss because the Cottonwood experiment was terminated and thus worthless. Second, they claim the district court erred in calculating the loss amount at $424,361 because the evidence presented for the value of the Cottonwood experiment and the advanced generation clone experiment was unreliable. They do not dispute the figures tied to the vehicles.

This is a mixed question of fact and law. "The district court's assessment of the amount of loss is a factual finding, which we will not disturb unless it is clearly erroneous." *United States v. Berheide*, 421 F.3d 538, 540 (7th Cir. 2005). However, the district court's conclusion that the destruction of the Cottonwood experiment caused the Forest Service to suffer a "loss," as that term is used in U.S.S.G. § 2B1.1, is reviewed de novo. *Id.* Defendants' argument on this point hinges on the fact that the Cottonwood experiment's funding was discontinued in 2000. They argue that once the funding was cut the experiment and the trees ceased to have any value. This is obviously not so. The fact that the experiment's funding was cut in 2000 does not mean that the experiment was worthless or that the Forest Service did not suffer a loss. The trees' value was not defined in relation to their continued funding, nor was there any evidence they would be ring-barked the moment funding was discontinued. Rather, the trees were an essential part of a twenty-year experiment, the fruits of which were never realized because of defendants' conduct. If the defendants chose a different method of protest that night, the trees would still be there and the prior decades

of research and toil would not be lost. The district court did not err in holding that defendants' conduct caused the Forest Service to suffer a loss.[3]

The crux of defendants' challenge to the loss-amount total is that the district court erred when it accepted Riemschneider's testimony and found that the cost of replacing the experiment was $424,361. At Christianson's sentencing, the government presented evidence of the loss amount through Riemschneider's testimony and the report he prepared in August 2000. He testified to the costs associated with the Cottonwood experiment and the advanced generation clone experiment and based these estimates on what he knew from his work on the project. His testimony and estimates were in accord with the report he prepared a month after the damage. And after listening to the testimony and making its own inquiries, the district court credited Riemschneider's

---

[3] The real issue at this point would still be present regardless of whether the funding was cut: how does a court determine the value of an ongoing experiment, the fruits of which could be worth a lot, a little, or something in between? The Guidelines anticipate such impossible situations by providing a less onerous and speculative method of calculating the loss involved: the cost of replacing the experiment. U.S.S.G. § 2B1.1, app. n. 3(C)(i); *see United States v. Galvez*, 108 F. Supp. 2d 1369, 1374 (S.D. Fla. 2000) (noting problems calculating lost profit with any degree of accuracy and instead choosing to use the replacement cost as a loss figure). Here, the district court applied such a calculation.

testimony, finding that his estimates were at least reasonable: "this estimate is actually a very very conservative one and lower than what was actually experienced."

A district court's loss-amount calculation "need only be a reasonable estimate of loss." *United States v. Watts*, 535 F.3d 650, 658 (7th Cir. 2008) (quotation omitted). And we review the finding for clear error. *Id.* To establish clear error, the defendant must show "that the court's loss calculations '[were] not only inaccurate but outside the realm of permissible computations.'" *United States v. Radziszewski*, 474 F.3d 480, 486 (7th Cir. 2007) (quoting *United States v. Lopez*, 222 F.3d 428, 437 (7th Cir. 2000) (further citation omitted)).

In this case, the district court's finding was well justified: Riemschneider's testimony was supported by a report he prepared shortly after the attack, and the district court credited Riemschneider's testimony. We defer to "the district court's determination of witness credibility, which can virtually never be clear error." *United States v. Acosta*, 534 F.3d 574, 584 (7th Cir. 2008) (quotation omitted). Further, a review of the sentencing transcript assures us that "the district court's inquiries were sufficiently searching to ensure the probable accuracy of the available evidence." *United States v. Lopez*, 222 F.3d 428, 438 (7th Cir. 2000). There is also no showing that the loss amount was inaccurate, and it is certainly not outside the realm of permissible computations. *Id.* at 437. Accordingly, we find that the district court did not commit clear error in calculating the loss amount.

### III.

Rivera also appeals the district court's finding that the terrorism enhancement under U.S.S.G. § 3A1.4 applies to his conduct. He makes two arguments for why that enhancement does not apply. The first is visceral and rests on the assumption that he is not a terrorist because his only motivation was "the hope of saving our earth from destruction" and redressing "the misdeeds and injustice that [he] felt industry inflicted on the natural world." The second rests on statutory interpretation grounds. Both lack merit.

Turning to the first argument, this much has to be clear: ELF and its members are not to be confused with the typical environmental protestor denouncing and peacefully demonstrating against such things as nuclear power, strip coal mining, cutting old-growth timber, offshore drilling, damming wild rivers, and so on. Rather, ELF members are of a different sort, and to group them with the well-meaning complainers of controversial projects is both inaccurate and purposely misleading.

ELF's members take their activism to unconscionable levels: since ELF's inception in 1987, its members have been responsible for bombings, arson, vandalism, and a host of other crimes. In fact, between 2000 and 2005, 43 of the 57 reported terrorist attacks committed on American soil were done by ELF members or their sister organization, the Animal Liberation Front.[4] ELF's terror attacks

---

[4] Federal Bureau of Investigation, *Terrorism 2002-2005* 64-65 (2005), *available at* http://www.fbi.gov/publications/terror/
(continued...)

have caused over fifty million dollars in damage to public and private property, including the arson of condominium complexes, multiple university research facilities, a ski resort, logging facilities, a high-voltage energy tower, and almost a score of other pieces of private property.[5] A perfunctory survey of some of the cases involving ELF shows the breadth of its destructive force, including a conspiracy stretching over five states and involving nineteen separate acts of arson.[6] Just as telling is the fate of the two uncharged co-conspirators in this case: Wallace is incarcerated for the attempted bombing of a university building, and McGowan is serving 84 months for arson and a host of other crimes. These people are not peaceful protestors.

---

[4] (...continued)
terrorism2002_2005.pdf.; *see also id.* at 41 ("The majority of domestic terrorism incidents from 1993 to 2001 were attributable to the left-wing special interest movements the Animal Liberation Front (ALF) and the Earth Liberation Front (ELF).").

[5] *Id.* at 3-4, 22, 29; *see also id.* at 7-9, 29 (noting five attacks that caused over fifty-five million dollars in damage).

[6] *E.g., United States v. Tankersly*, 537 F.3d 1100, 1103-05 (9th Cir. 2008) (noting defendants' conspiracy involving arson and bombings); *see also id.* at 1103, n.2 (summarizing the arsons committed in the conspiracy); *United States v. Thurston*, 2007 WL 1500176 **1-4 (D. Or. May 21, 2007) (detailing a multi-defendant conspiracy across five states focusing on arson and bombings of private property); *United States v. McDavid*, 2006 WL 734877, *3 (E.D. Cal. 2006) (noting defendant's advocacy for Molotov cocktails and threats to kill a confidential source).

Here, the defendants' actions were of the same sort, only they refrained from using explosives: they conducted reconnaissance and determined that to be effective they needed another person; they trespassed onto the facility and destroyed over 500 trees that were part of several experiments, ruining in a single night decades of others' work; they vandalized several vehicles with the ominous threat that "WE ARE WATCHING" and "THE ELVES ARE WATCHING." And that was all before they were scared away by a security guard. Far more havoc may have been done had they not been interrupted.

Beyond the damage inflicted, it is impossible to calculate how these acts would have intimidated the workers of the Rhinelander facility. Arriving at work the next day, employees were greeted with "F*** U USFS" and "F*** TREE BIOTECH" spray-painted on their work vehicles. And as the employees surveyed the facility, they discovered that valuable experiments they spent decades working on had been destroyed. The employees would be familiar with ELF, and the communique about the attack the next day foreshadowing "more appropriate action" would likely make employees think twice before they stayed late at work or came in on the weekend to finish some project. Such behavior is not in the same genus of non-destructive and non-violent protests that can be honestly described as well meaning but misguided.

Simply put, a terrorist is "any one who attempts to further his views by a system of coercive intimidation."

XVII *Oxford English Dictionary* 821 (2d ed. 1989); *accord Webster's Third New International Dictionary* 2361 (1981) ("an advocate or practitioner of terror as a means of coercion."). The *Oxford English Dictionary* goes on to explain that the "term now usually refers to a member of a clandestine or expatriate organization aiming to coerce an established government by acts of violence against it or its subjects." *Id.* The Guidelines provide a practical definition for what constitutes an act of terrorism, and thereby establishes a very workable definition of who is a terrorist. It looks at the crime involved and the perpetrator's motive. If the act is among the litany of crimes listed in § 2332b(g)(5)(B), which include a bevy of the most harmful and odious acts in the criminal code, including everything from murder and torture to the destruction of government property, and it was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," then it is a federal crime of terrorism. *Id.* And for all intents and purposes at sentencing, that person is a terrorist.

Here, the purpose behind defendants' actions was to further ELF's political agenda: the end to industrial society. The method they chose to communicate this desire was not a peaceful protest with speeches, songs, and a petition outside the facility but instead a violent attack against the facility and the experiments. Because the defendants do not look the part of our current conception of a terrorist does not separate them from that company. Indeed, it doesn't matter why the defendants oppose capitalism and the United States

government—if they use violence and intimidation to further their views, they are terrorists. Despite Rivera's denial that he is a person who uses violence and intimidation to serve his political ends, the evidence sufficiently defines him as a terrorist, and the enhancement is appropriate.

Alternatively, Rivera argues that the district court erred in applying the terrorism enhancement to his conduct because his crime was purely domestic and did not transcend national boundaries. We review a district court's application of the Guidelines de novo. *United States v. Lacey*, 569 F.3d 319, 324 (7th Cir. 2009). The terrorism enhancement at § 3A1.4 of the Guidelines applies if the crime "involved, or was intended to promote, a federal crime of terrorism." U.S.S.G § 3A1.4. The Guidelines define "federal crime of terrorism" with reference to 18 U.S.C. § 2332b(g)(5). That subsection has two requirements. The first is that the crime was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A). There is no question about that here. The second is that the crime is among those listed in § 2332b(g)(5)(B); among the crimes listed there is the destruction of government property under § 1361. And that is what Rivera pleaded guilty to.

Rivera, however, argues that § 3A1.4 could not simply incorporate the definition provided in § 2332b(g)(5) without incorporating all of § 2332b, which is titled "Acts of Terrorism Transcending National Boundaries." Much of this rests on Rivera's belief that by only incorpo-

rating § 2332b(g)(5) and not all of § 2332b, the sentencing commission is discarding much of § 2332b as meaningless or surplus. Notwithstanding Rivera's argument, nothing prohibits the Sentencing Commission from defining a term by referencing a particular definition in a statute while ignoring the rest of the statute. It, in fact, does it throughout the Guidelines. *E.g.,* U.S.S.G. § 2M6.1 app. n. 1.; *id.* § 3b1.3, app. n. 2(b) & 5(a); *id.* § 3B1.5 app. n. 1 (defining "Drug trafficking crime" as that term is defined in 18 U.S.C. § 924(c)(2)).

A defendant who does not meet the requirements for a conviction under § 2332b may still fall under the provisions of § 2332b(g)(5) and in turn warrant the terrorism enhancement. *United States v. Arnaout*, 431 F.3d 994, 1002 (7th Cir. 2005). We have previously noted that § 3A1.4 applies "where a defendant is convicted of a federal crime of terrorism as defined by 18 U.S.C. § 2332b(g)(5)(B) *or where* the district court finds that the purpose or intent of the defendant's substantive offense of conviction or relevant conduct was to promote a federal crime of terrorism as defined by § 2332b(g)(5)(B)." *United States v. Hale*, 448 F.3d 971, 988 (7th Cir. 2006) (quoting *Arnaout*, 431 F.3d at 1001) (internal alterations omitted); *see also United States v. Ashqar*, 582 F.3d 819 (7th Cir. 2009) (upholding the enhancement applying to a defendant convicted of criminal contempt). On this point the Fifth Circuit has observed that of the crimes listed in § 2332b(g)(5)

> none . . . has as an element requiring conduct transcending national boundaries. All that section 3A1.4

requires for an upward adjustment to apply is that one of the enumerated offenses was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

*United States v. Harris*, 434 F.3d 767, 773 (5th Cir. 2005) (quotation omitted). Thus, we reject Rivera's argument that for the terrorism enhancement under § 3A1.4 to apply, his conduct must meet the jurisdictional element to § 2332b, *i.e.*, that the crime transcend national boundaries. 18 U.S.C. § 2332b(b).

IV.

The district court did not err in finding that the destruction of two experiments and the vandalism of several Forest Service vehicles caused the government to suffer a loss nor did it err in calculating the loss amount at $424,361. Further, there is no merit to Rivera's argument that he's not the sort of person who should be labeled a terrorist and that the terrorism enhancement does not apply unless his crime transcended national boundaries. Thus, we AFFIRM.

11-9-09